# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action File No. 1:12-CV-1996- TWT |
| BENJAMIN DANIEL DEHAAN and LIGHTHOUSE FINANCIAL PARTNERS, LLC, | |
| Defendants. | |

| | |
|---|---|
| S. GREGORY HAYS, Receiver for LIGHTHOUSE FINANCIAL PARTNERS, LLC, | |
| Plaintiff, | |
| v. | Ancillary Proceeding File No. _____ |
| PAGE PERRY, LLC, ESTATE OF J. BOYD PAGE, ALAN R. PERRY, JR., J. STEVEN PARKER, ROBERT D. TERRY, and DANIEL I. MacINTYRE, | |
| Defendants. | |

1

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff S. Gregory Hays ("Hays"), as Receiver for Lighthouse Financial Partners, LLC ("Lighthouse"), by and through the undersigned counsel of record, and for his Complaint against Defendants Page Perry, LLC ("Page Perry"), the Estate of J. Boyd Page, Alan R. Perry, Jr., J. Steven Parker, Robert D. Terry, and Daniel I. MacIntyre ("Defendants") shows the Court as follows:

### Nature of Action

1.

This is an action for professional malpractice, breach of fiduciary duty and breach of contract.  Plaintiff alleges that Page Perry, a securities law firm, and the individual Defendants breached applicable standards of care in performing legal services for Lighthouse.  Plaintiff seeks damages in excess of $5 million plus disgorgement of all legal fees paid to Defendants.

### Parties, Jurisdiction and Venue

2.

Defendant Page Perry is a Georgia limited liability company and is subject to the jurisdiction and venue of this Court.  Service of process may be perfected

by delivery of a copy of the Complaint and summons to its registered agent Donald C. Beskin, 5180 Roswell Road, NE, Suite 201, Atlanta, Georgia 30342.

3.

Defendant Estate of J. Boyd Page is a Georgia Estate currently pending in the Fulton County Probate Court and is subject to the jurisdiction and venue of this Court. Service of process may be perfected by delivery of a copy of the Complaint and summons to the Executor of the Estate Donald C. Beskin at 5180 Roswell Road, NE, Suite 201, Atlanta, Georgia 30342.

4.

Defendant Alan R. Perry, Jr. is a Georgia resident domiciled in the Northern District of Georgia and is subject to the jurisdiction and venue of this Court. Service of process may be perfected by delivery of a copy of the Complaint and summons to Alan R. Perry, Jr. at 1552 Shady Falls Road, Blue Ridge, Georgia 30513.

5.

Defendant J. Steven Parker is a Georgia resident domiciled in the Northern District of Georgia and is subject to the jurisdiction and venue of this Court. Service of process may be perfected by delivery of a copy of the Complaint and summons to J. Steven Parker at 201 Barrington Hills Dr., Atlanta, Georgia 30350.

6.

Defendant Robert D. Terry is a Georgia resident domiciled in the Northern District of Georgia and is subject to the jurisdiction and venue of this Court. Service of process may be perfected by delivery of a copy of the Complaint and summons to Robert D. Terry 1388 Cornell Road, NE, Atlanta, Georgia 30306.

7.

Defendant Daniel I. MacIntyre is a Georgia resident domiciled in the Northern District of Georgia and is subject to the jurisdiction and venue of this Court.  Service of process may be perfected by delivery of a copy of the Complaint and summons to Daniel I. MacIntyre   at 40 Glen Oaks Drive, NW, Atlanta, Georgia 30327.

8.

Plaintiff Hays was appointed as Receiver for Lighthouse and any assets acquired for the benefit of Lighthouse (collectively the "Receivership Estate") pursuant to an Appointment Order dated July 2, 2012 in this civil enforcement action styled *Securities and Exchange Commission v. Benjamin Daniel DeHaan and Lighthouse Financial Partners, LLC,* In the United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action File No. 1:12-CV-1996-TWT (the "Receivership Action").

9.

This Court has subject matter jurisdiction over this case pursuant to 18 U.S.C. §§ 1345 and 1367 in that it arises out of and is related to the matters at issue in the Receivership Action and is so related to the claims asserted therein that it forms part of the same case and controversy. This Court also has ancillary jurisdiction over this action as it is an action instituted by the Receiver in order to execute his duties as set forth in the Appointment Order, and this action seeks to accomplish the ends sought by the Receivership Action in which the Receiver was appointed. *See, Haile v. Henderson National Bank,* 657 F. 2d 816, 822 (6th Cir. Tenn 1981) ("district court has ancillary subject matter jurisdiction of every such suit [initiated by the receiver] irrespective of diversity, amount in controversy or any other factor which would normally determine jurisdiction."); *Pope v. Louisville, New Albany & Chicago Railway,* 173 U.S. 573, 577 (1899) (receiver may proceed in ancillary jurisdiction on claims with no other independent basis for federal jurisdiction).

10.

Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the action occurred in this district and a substantial part of the property that is the subject of this action is located in this district.

**Factual Allegations**

11.

Lighthouse Financial Partners, LLC ("Lighthouse") is a Georgia limited liability company formed on October 10, 2007.  It's manager and majority owner is Benjamin DeHaan ("DeHaan").

12.

Lighthouse is a Registered Investment Advisor ("RIA") firm licensed to provide financial planning, investment advice and portfolio management services to its advisory clients, and as such, is subject to regulation by the United States Securities and Exchange Commission ("SEC"), the Georgia Secretary of State Securities Division, and the Financial Industry Regulatory Authority ("FINRA").

13.

Under federal securities regulations and Georgia securities regulations in effect prior to 2011, an RIA firm such as Lighthouse is generally prohibited from taking custody of its clients' money or securities unless certain strict investor protection rules are followed.  Rather, each client must have a brokerage account opened in his own name and custody must be maintained by a qualified custodian, *i.e.,* a bank or broker-dealer, both of which are subject to rigorous regulations designed to safeguard the clients' funds.

6

14.

The regulations also mandate that the client receive monthly or quarterly account statements directly from the bank or broker-dealer with custody of the client's assets.

15.

In order to guard against misappropriation of client assets, if an RIA does take custody of its clients' money or securities, the RIA is required to (1) report to federal and state regulators that it has custody of client assets, and (2) undergo additional scrutiny, such as additional audits and reporting requirements.

16.

From 2007 through 2012, Lighthouse reported annually to federal and state regulators in its Form ADV that it did *not* have custody of client funds and that the broker-dealers that had sole custody of its clients' funds were Interactive Brokers and/or TD Ameritrade.

17.

In fact, however, Lighthouse did take custody of client funds -- and between 2007 and 2012, DeHaan misappropriated approximately $7 million from Lighthouse and its clients.

18.

Specifically, at the direction of DeHaan, Lighthouse opened a bank account labeled as the "Client Holding - Pass Through" Account, into which client funds were deposited. DeHaan then (1) transferred a portion of those funds to his personal bank accounts and used it to pay his personal bills and expenses or to acquire assets in his own name, and (2) used a portion of the funds to pay legal fees to Page Perry. DeHaan then created fictitious account statements which he provided to Lighthouse's clients to conceal his theft of their funds.

### The Books and Records Inspection

19.

In December 2011, the Securities Commissioner in the Georgia Secretary of State's Office ("Commissioner") began a books and records inspection of Lighthouse. Such inspections are routine and are randomly conducted by the Commissioner's office to ensure RIA compliance with applicable regulations.

20.

The books and records inspection immediately revealed a number of irregularities, most notably that Lighthouse could not produce monthly account statements from Interactive Brokers or TD Ameritrade for its clients' accounts.

8

21.

In addition, Lighthouse could not accurately state the amount of client assets that it had under management, and could not provide an accurate master list of its clients.

22.

As a result of these irregularities, the Commissioner's office opened a formal investigation into Lighthouse and DeHaan in January 2012. In the course of its investigation, the Commissioner's office contacted Interactive Brokers and TD Ameritrade to verify the accounts of Lighthouse's clients -- and discovered that virtually none of the accounts existed.

23.

The Commissioner's office also discovered that most of the client accounts had never been opened at all, while others were opened briefly but later closed with DeHaan depositing the money from the closed accounts into the Pass Through Account and then converting it to his own use.

24.

The Commissioner's office also discovered that the Interactive Brokers and TD Ameritrade account numbers that DeHaan had provided to it were fictitious, that DeHaan had been creating and providing fictitious account statements to

Lighthouse's advisory clients, and that DeHaan had misappropriated almost all of the funds invested by Lighthouse's clients.

25.

In March 2012, the SEC launched its own investigation of Lighthouse and DeHaan, and sent a subpoena to DeHaan to testify under oath and to produce additional documents.

26.

In April 2012, DeHaan testified before the SEC and gave false information and testimony.

27.

On June 12, 2012, the SEC initiated this Receivership Action by filing a civil enforcement action against Lighthouse and DeHaan.   Shortly thereafter, the assets of Lighthouse were frozen and Hays was appointed as Receiver.

28.

DeHaan was subsequently indicted on multiple counts of wire fraud and securities fraud.  On February 1, 2013, he pled guilty to one count of wire fraud and was sentenced in November 2013 to serve 87 months in a federal penitentiary.

**Page Perry's Involvement in DeHaan's Fraudulent Scheme**

29.

Defendant Page Perry is an Atlanta law firm that purports to have extensive knowledge and expertise in the field of securities law. Indeed, on its website, the firm boasts that it "built its reputation representing investors victimized by the fraudulent and unethical business practices of bad brokers and brokerage firms." (A copy of Page Perry's homepage is attached as Exhibit 1).

30.

In or about 2005, Page Perry began also providing compliance services and legal representation to brokers and investment advisors such as Lighthouse. The firm's website again touts its special expertise and "pro-investor" reputation in this area: "It is precisely because of our experience and reputation as being pro-investor that reputable and honest investment advisers and brokers began seeking our advice." (*Id.*) In fact, Page Perry used its reputation of representing "victimized investors" and "protecting investor rights" to bolster the reputation and honesty of the investment advisers it represents: "You have to be a particular kind of adviser to want to work with us: one that takes its obligations to its clients seriously and wants to do everything possible to improve compliance and customer service." (*Id.*)

11

31.

The two partners at Page Perry who headed the firm's "Regulatory Practice Group", Defendants J. Steven Parker ("Parker") and Robert D. Terry ("Terry"), both formerly served as the Commissioner of Securities in the Securities Division of the Secretary of State, the highest securities industry regulatory position in the state of Georgia. Page Perry also promoted this high-level regulatory expertise as the underpinning of its compliance services practice: "...the skills and specialized knowledge our lawyers and other professionals developed representing harmed investors and serving as regulators and regulatory counsel are the same ones necessary to advise a compliance-oriented, client-first financial firm and to represent firms against charges of wrongdoing." (*Id.*)

32.

From 2008 through 2012, during virtually the entirety of its existence, Lighthouse was represented by Page Perry. Thus, DeHaan was able to use Page Perry's "pro-investor" reputation to garner trust and confidence with Lighthouse's clients -- even as he committed a massive fraud on those same clients under the watchful eye of Page Perry.

**Initial Services and Retainer Agreement**

33.

In September 2008, shortly after Lighthouse was formed, DeHaan met with Parker and Daniel MacIntyre ("MacIntyre"), another partner at Page Perry, concerning the legal needs of Lighthouse and legal services to potentially be provided by Page Perry.

34.

Shortly thereafter, Page Perry entered into a Retainer Agreement with Lighthouse dated December 9, 2008. (A copy of the Retainer Agreement is attached hereto as Exhibit 2).

35.

The Retainer Agreement expressly provides that: "Our client in this engagement will be Lighthouse Financial Partners, LLC (the "Company" or "you"). We will not represent any individual or other entity in this engagement." (*Id.*)

36.

One of the services that Page Perry agreed to provide pursuant to the Retainer Agreement was "[t]o advise the Company regarding all registration, licensing and regulatory requirements, including, as applicable, the requirements

13

of the Securities and Exchange Commission and all state securities and investment advisor regulators." (*Id.*)

37.

On information and belief, between December 2008 and June 2012, Page Perry charged Lighthouse a retainer fee of $6,000 per month plus additional charges for expenses, for a total of more than $228,000 in legal fees.

**As Lighthouse's Regulatory Compliance Counsel,**
**Page Perry Knew or Should Have Discovered DeHaan's Fraud**

38.

Over the course of the three and a half years that Page Perry represented Lighthouse, there were numerous glaring irregularities with Lighthouse's books and records and business practices that alerted or should have alerted Page Perry of DeHaan's fraudulent scheme. However, Page Perry repeatedly failed to inquire about any of these obvious red flags and on numerous occasions, took action to help DeHaan avoid detection by regulators and investors.

39.

For instance, in an effort to avoid an audit that may have exposed irregularities, one of the first things Parker did as Lighthouse's counsel was to write to the Georgia Securities Commissioner on April 17, 2009 to inquire

14

whether (1) an RIA was deemed to have "custody" of client funds if it had a contractual ability to deduct its fees from its clients' accounts; and (2) if so, whether the Commissioner would grant a waiver to Lighthouse of the requirement of audited financial statements to account for client funds in its custody. (A copy of Parker's email is attached herto as Exhibit 3). Notably, Parker's email was addressed to Terry, who subsequently became a partner at Page Perry but at that time was the Georgia Securities Commissioner.

40.

DeHaan was copied on Parker's April 17, 2009 email to Terry, and in response, DeHaan wrote to Parker: "I am confused. I never take custody of client funds...*they have written checks to Lighthouse in the past,* but I have signed them over to the custodian bank." (*Id.*) (Emphasis added). At that time, however, Parker should have been suspicious of DeHaan's handling of Lighthouse's client funds, or at worst was paving the way for the fraud that ensued. Indeed, the waiver Parker sought would have effectively served to conceal DeHaan's unlawful conduct.

41.

In fact, on September 10, 2009, DeHaan opened an account with Bank of America, in Lighthouse's name, which gave Lighthouse "custody" of client funds.

15

He designated this as the "Client Holding - Pass Through" Account.  The name implies that the purpose of the account was to hold client funds being "passed through" from Lighthouse's clients to Interactive Brokers or TD Ameritrade, or from the brokerage firms back to Lighthouse's clients. However, if DeHaan was in fact signing checks over to the brokerage firms as he had claimed, such an account would not be necessary (or even permitted) because client funds should go directly from the client to the custodian firm or vice versa, and should never "pass through" Lighthouse's bank account at all.

42.

Parker was aware of the Client Holding - Pass Through Account but did nothing to address this regulatory violation or prevent DeHaan from using the Pass Through Account to misappropriate funds from Lighthouse and its clients. Notably, DeHaan would later testify that his "sole source of income" was this C;ient Holding - Pass Through Account.

**The 2010 Mock Audit Conducted by Page Perry**

43.

As part of the services it provides, Page Perry performs "mock audits" of its clients in order to help identify any compliance issues (and earn extra fees).

Indeed, Page Perry represented that the mock audit, conducted by Parker, a former state Securities Commissioner, would simulate an actual audit performed by the Commissioner's office.

44.

In July 2010, Parker performed a mock audit of Lighthouse, including an examination of its books and records, and reported his findings on September 30, 2010. (A copy of the Report is attached hereto as Exhibit 4). As noted in the Report, the first stage of the audit was a "comprehensive client file review." (*Id.*) However, the "comprehensive" review of client files apparently did not include any effort to confirm the safeguarding of client funds, verify the existence of the clients' accounts at Interactive Brokers or TD Ameritrade, or determine where client funds were being held. Rather, the Report focused primarily on where client files were housed in Lighthouse's office and recommended "for better organization" that Lighthouse use a different color file folder for its client files to differentiate them from vendor files. (*Id.*)

45.

Notably, in connection with the mock audit, Parker received and reviewed Lighthouse's 2010 financial statements, which were highly suspicious on several fronts. (A copy of the 2010 financial statements is attached hereto as Exhibit 5).

46.

First, the accountant's transmittal email that accompanied the 2010 financial statements *twice* referenced the "Pass Through Account" and noted that the financial statements were "still in draft state" because he could not reconcile the deposits into that account. (*Id.*) Moreover, the draft Balance Sheet showed an $800,000 *negative balance* in the "Client Holding - Pass Through" Account. (*Id.*) Yet Parker did not question the existence, purpose or use of the Pass Through Account, and apparently did nothing to determine what client funds had been deposited into the Pass Through Account (in violation of state and federal regulations) or, more importantly, why Lighthouse owed $800,000 to its clients.

47.

In addition, the draft Profit and Loss Statement showed only $364,120 in total revenue -- $101,818 of which was paid to Page Perry for legal fees. (*Id.*) Obviously, no legitimate firm could afford to pay 1/3 of its revenue for legal fees.

48.

However, the only thing Parker questioned from the dubious financial statements was the "low income figures." After seeing the $364,120 income figure for 2010, Parker sent an email to DeHaan stating that "I don't understand the low income figures. 2009 was over $1 MM and I thought it was going to be

about the same for 2010." (A copy of Parker's email is attached hereto as Exhibit 6). A few days later, Parker sent another email to DeHaan that said "...please take another look at the revenues shown on the [2010] P&L and *tell me what's missing."* (A copy of Parker's email is attached hereto as Exhibit 7) (Emphasis added).

49.

In response, DeHaan sent revised financial statements to Parker in which the revenue figure was mysteriously increased to $622,619. (A copy of the revised financial statement is attached hereto as Exhibit 8). Importantly, the revised 2010 Balance Sheet still showed a negative balance of $752,000 in the "Client Holding -- Pass Through " Account. It was obvious from even a cursory review of these financial statements that Lighthouse was not being operated as a legitimate business enterprise.

50.

Shortly thereafter, on March 29, 2011, DeHaan advised Parker that Lighthouse had $64 million in client funds under management, or assets under management ("AUM"), as of 12/31/10 -- but Lighthouse's office manager promptly corrected DeHaan, advising that the correct number was $36 million in 83 client accounts. (A copy of the email string is attached hereto as Exhibit 9).

19

51.

Nonetheless, Parker did nothing to address or even inquire about these wild variations in revenue figures and AUM.

52.

Furthermore, on March 14, 2011, Parker sent an email to DeHaan which stated:

> I re-checked the Georgia custody rule.  You can receive checks made payable to "third parties," *but not checks made payable to you.*  If you receive checks payable to Lighthouse, you still do not have custody if you return them within 3 business days.

(A copy of Parker's email is attached hereto as Exhibit 10)  (Emphasis added). Since Parker had known for 2 years, since at least April 17, 2009, that DeHaan was receiving checks payable to Lighthouse, he was well-aware of the Client Holding - Pass Through Account, and he knew that the Pass Through Account had a negative balance of approximately $800,000, he was obviously counseling DeHaan as to how to avoid detection by the regulators.

**The 2011 Mock Audit Conducted by Page Perry**

53.

In August 2011, Page Perry began the next annual mock audit of Lighthouse which generated additional fees.  To assist, Parker hired Em Walker

("Walker"), a former staff attorney with the Georgia Securities Commissioner who had left the Commissioner's Office and was now a Compliance Consultant with a company called Regulatory Compliance and Management Consulting.

54.

In preparation for the mock audit scheduled for September 1, 2011, Parker sent DeHaan a list of documents that would need to be made available to Walker during the audit. (A copy of Parker's correspondence is attached hereto as Exhibit 11). Notably, the list specifically included "access to client files including...custodial account applications and statements...." (*Id.*)

55.

On the day of the audit, September 1, 2011, Walker visited Lighthouse's office but was unable to complete the audit that day because DeHaan was unable to provide bank statements, financial statements or client account statements, all of which should have been readily available. In fact, DeHaan was unable to produce most of the documents that Parker had requested.

56.

Notably, based on her visit to Lighthouse on September 1, 2011, Walker prepared a Preliminary Report which states that, based on the available records at Lighthouse's office, the "Firm has twelve (12) active accounts." (A copy of the

Preliminary Report is attached hereto as Exhibit 12).  However, Parker had been advised 6 months earlier by Lighthouse's office manager that the Firm had 83 client accounts.  (*See,* Email string, Exhibit 9 above).

57.

Thus, in addition to all the other irregularities, Parker was aware of a huge gap in missing client account files.  Upon information and belief, Parker did nothing to investigate or even inquire about the disparity in the number of client accounts.

58.

In addition, under "Matters of Concern", the Preliminary Report recommended "Conduct due diligence to ensure clients are receiving statements [from] Interactive Brokers or TD Ameritrade." (*See,* Preliminary Report, Exhibit 12 above).  But Parker did not ask Walker to obtain the client statements and complete the mock audit and in fact did not respond to Walker's recommendation for additional due diligence regarding this issue.  Furthermore, the Preliminary Report also indicated that other matters of concern included the DeHaan Fund, LP and two other entities related to Lighthouse.  Parker apparently also failed to make any further inquiry about these matters of concern.

22

59.

A full week after the mock audit was conducted, Walker wrote to Parker with a list of 23 items that were still delinquent, and the list included a lack of bank statements showing checks received and disbursements made, and a lack of "access to client statements." (A copy of Walker's email dated September 8, 2011 is attached hereto as Exhibit 13).

60.

Rather than asking DeHaan to provide access to Lighthouse's client statements, Parker then wrote to Interactive Brokers on September 12, 2011 and merely asked Interactive Brokers for "reasonable assurances" that it was sending quarterly account statements to Lighthouse's clients. (A copy of Parker's letter is attached hereto as Exhibit 14). However, the letter did not identify Lighthouse's clients or even specify the number of accounts, but merely posed the question generically. (*Id.*) Oddly, no response was received -- which should have been cause for concern to Parker since a reputable brokerage firm would normally respond to an attorney asking for proof of compliance with securities laws. In this case, one explanation for Interactive Brokers' failure to respond may be that Lighthouse had no client accounts custodied there, which Parker could easily have discovered at that point. But instead of following up with Interactive Brokers,

23

Parker merely instructed DeHaan to send the same letter to Interactive Brokers under his own signature. (A copy of DeHaan's letter is attached hereto as Exhibit 15). Notably, DeHaan's letter was addressed to a "Ted K." The fact that DeHaan did not even know the full name of his contact at Interactive Brokers should have raised yet another red flag for Parker.

61.

On October 4, 2011, Parker met with DeHaan and the Minutes from that meeting note that Lighthouse "is currently non-compliant with custody requirements due to IB's inability to provide account statements to clients." (A copy of the Minutes is attached hereto as Exhibit 16).

62.

On October 19, 2011, Parker again wrote to Lighthouse's office manager and requested documents showing checks received and disbursements made, and a master list of the client accounts at Interactive Brokers and TD Ameritrade. (A copy of Parker's email is attached hereto as Exhibit 17). On October 25, 2011, the office manager advised Parker that these documents were still not available. (A copy of the office manager's email is attached hereto as Exhibit 18).

63.

On November 18, 2011 -- 2 1/2 months after the date of the mock audit --

24

Page Perry issued a Mock Audit Report that was 7 pages long listing "deficiencies" including: "Client transaction records were not available at time of audit." (A copy of the Report is attached hereto as Exhibit 19). Thus, knowing that Lighthouse had custody of client funds in the Pass Through Account and that it could not produce client account statements from the purported custodian firms, it was abundantly clear to the seasoned attorneys at Page Perry that client funds were unaccounted for. Yet, Page Perry did nothing to safeguard Lighthouse's client funds, but instead simply issued a Mock Audit Report that stated that "Books and Records maintenance is *significantly deficient*" and "[c]ustody safekeeping requirements *not met....*" (*Id.*)

64.

Two weeks later, Lighthouse's office manager wrote to Parker and proposed a meeting for December 13, 2011 to address the "significant deficiencies." (A copy of the office manager's email dated November 30, 2011 is attached hereto as Exhibit 20). Thus, 3 1/2 months after the mock audit, none of these glaring deficiencies had been addressed or corrected.

65.

That meeting never occurred, and on December 14, 2011, Lighthouse received notice from the Commissioner that it planned to conduct a books and

records inspection. (A copy of the Notice is attached as Exhibit 21).  By January 2012, the Commissioner's Office had discovered the "significant deficiencies" and opened an investigation into DeHaan and Lighthouse.

**Page Perry was Aware of Deficiencies in Lighthouse's Reporting Software and That Lighthouse's Clients Were Not Receiving Statements from the Custodian Firms**

66.

Beginning in 2010, Lighthouse began utilizing investment management software known as "Quantplat" that could be accessed by clients of Lighthouse, which purportedly reflected account balances and activity in their accounts. However, the trading activity and balances were manually entered by DeHaan, and Quantplat was not integrated with the custodian firms that were supposedly holding the funds deposited by Lighthouse's clients.  This created an obvious risk that DeHaan could falsify the account statements of Lighthouse's clients. Furthermore, since DeHaan had been depositing client funds into the Client Holding - Pass Through Account, there was a significant risk of misappropriation of funds from Lighthouse and its clients.

67.

Page Perry was aware of this deficiency in the Quantplat software at least as

26

early as October 2010. Indeed, on October 20, 2010, Parker sent correspondence to Alina Singer ("Singer"), counsel for the co-developer of the Quantplat software, regarding negotiations for a potential joint venture between DeHaan and Singer's client which noted that

> It is envisioned that the [Quantplat] software will be fully automated, that is to say that the software, without necessity of human intervention, will generate the orders for the underlying transactions. For now, however, that feature is not available.

(A copy of Parker's letter is attached hereto as Exhibit 22).

68.

By February 2011, four months later, the flaw in the Quantplat software had not been corrected, and on February 4, 2011, Parker sent additional correspondence to Singer noting that the problems with the software being susceptible to easy manipulation had still not been rectified. (A copy of Parker's letter is attached hereto as Exhibit 23). At that time, Parker was aware of the fact that the Quantplat software was already in use and being made available to Lighthouse's clients.

69.

By June 2011, the deficiency with the Quantplat software had still not been corrected. At that time, Parker sent a letter on June 15, 2011 to DeHaan

purporting to "remind" him that clients must receive account statements from Interactive Brokers or TD Ameritrade at least quarterly in order to avoid running afoul of federal and state regulations. (A copy of Parker's letter is attached hereto as Exhibit 24). However, Parker knew that Lighthouse's clients were not receiving accounts statements from Interactive Brokers or TD Ameritrade, and that the Quantplat software was the only account information being provided to the clients -- even though it was being created by DeHaan and was completely unverifiable without account statements from the custodian firms (which DeHaan had been unable to produce for the last 6 months).

70.

Thus, in mid 2011, Page Perry knew that DeHaan was receiving funds directly from Lighthouse's clients and depositing those funds into the Client Holding - Pass Through Account; that the Pass Through Account had a negative balance of approximately $800,000; that DeHaan was providing self-generated account information to Lighthouse's clients via Quantplat software that was not integrated with the custodian firms; and that the purported custodians of the client accounts were not providing monthly or quarterly account statements to clients to verify the information provided via Quantplat. Taken together, this created an obvious risk of misappropriation of funds from Lighthouse and its clients, and

28

creation of fictitious account statements to hide the theft -- which was exactly what DeHaan was doing.

71.

However, Page Perry not only failed to inquire further or to address these problems to protect Lighthouse, in September 2011, Parker conducted his second mock audit of Lighthouse -- and did not include any verification of client accounts held by custodian broker-dealers or reconciliation of client funds and trading activity as reported on Quantplat with actual account statements from Interactive Brokers and TD Ameritrade.

72.

In fact, Parker knew for months after the mock audit that DeHaan was unable to produce account statements from Interactive Brokers or TD Ameritrade for Lighthouse's client accounts and moreover, could not even provide an accurate list of client accounts or accurately report the amount of client assets that Lighthouse had under management.

73.

These problems were raised by Walker in the Preliminary Mock Audit Report on September 8, 2011, which noted that clients were totally reliant on the Quantplat software and recommended "due diligence to ensure clients are

receiving statements [from] Interactive Brokers or TD Ameritrade. (*See,* Preliminary Report, Exhibit 12 above). However, Page Perry did no additional due diligence regarding this issue, the Quantplat software was never integrated with the custodian firms -- and when Parker issued the final Mock Audit Report on November 18, 2011, it merely noted as a deficiency that client account statements were not available, but it omitted Walker's recommendation of due diligence to ensure that clients were receiving monthly account statements from the custodian firms. (*See,* Mock Audit Report, Exhibit 19 above).

### Page Perry Materially Aided DeHaan by Helping to Conceal the Fraud

74.

From December 2011, when the Commissioner's Office began its books and records inspection, through June 2012, when the SEC filed this enforcement action and froze Lighthouse's assets, Page Perry continued to represent Lighthouse, and actually helped DeHaan conceal his fraudulent scheme, to the detriment of Lighthouse and its clients.

75.

In January 2012, Parker and Terry worked closely with DeHaan to help him "get ready for" the Commissioner's audit, which was scheduled for January 31,

2012.  Specifically, Page Perry obtained and provided documents and written responses to the Commissioner's requests for documents and information.

76.

Notably, during the inspection on January 31, 2012, one of the first things the Commissioner's office asked to see was the client account statements from Interactive Brokers or TD Ameritrade for 4 of Lighthouse's clients -- and the auditor immediately became suspicious when DeHaan could not instantly produce the statements *while she was in his office on the day of the audit*.  Of course, at that point, Parker knew that DeHaan had been unable to produce client account statements from Interactive Brokers or TD Ameritrade *for the last 6 months,* ever since the mock audit on September 1, 2011.

77.

The auditor also was immediately suspicious of the "Client Holding - Pass Through" Account shown on the Balance Sheet, and therefore requested additional documentation related to that account.  Again, Parker had been aware of the Pass Through Account since 2010 and had never even requested any back-up information regarding the suspicious account.

78.

By February 22, 2012, three weeks after the audit, the auditor was still

31

emailing DeHaan requesting the client account statements from Interactive Brokers and TD Ameritrade, and back-up documents for the Pass Through Account. In response, on February 23, 2012, Lighthouse's office manager wrote to Parker and asked, "How should we proceed", claiming that DeHaan was going to request the account statements from TD Ameritrade but did not know how long it would take to get them. (A copy of the office manager's email is attached hereto as Exhibit 25).

79.

Incredibly, Parker responded that same day: "It is not a good thing when an Investment Adviser can't produce client statements *at the drop of a hat.* This is something we need to rectify." (*Id.*) (Emphasis added). Yet Parker had known for years that DeHaan could not produce client statements for Lighthouse's clients "at the drop of a hat." In fact, Walker had requested client account statements prior to and during the mock audit 6 months earlier -- and DeHaan still had not produced them to Parker or Walker.

80.

Ultimately, Parker helped DeHaan come up with an excuse to give the Commissioner's office to temporarily satisfy its concerns. In an email dated March 5, 2012 with the heading "My proposed language to [the state auditor]",

32

Parker drafted a letter claiming that DeHaan had been unable to obtain the client statements because TD Ameritrade had provided Lighthouse with the wrong phone numbers. The letter goes on to state that DeHaan had just gotten the correct phone numbers and would "now have access to copies of all client account statements." (A copy of Parker's email is attached hereto as Exhibit 26). At the time he drafted this language, Parker knew it to be false. Upon receipt of Parker's email, DeHaan cut and pasted Parker's proposed language and sent it to the state auditor under his own signature.

81.

Shortly thereafter, Parker began also helping DeHaan evade the auditor's questions regarding the Pass Through Account. On March 24, 2012, Parker wrote to DeHaan:

> I still have some concerns that the Secretary of State will look very carefully at this account and seek additional information regarding its operation. I believe we described it to the auditors as an account into which client money coming to or from Lighthouse temporarily resides before being "passed through" to Lighthouse (in the case of a deposit) or to the client (in the case of a withdrawal).
>
> But the general ledger doesn't back that up as a totally accurate description. For instance, just perusing it I see a check to "KSS Family Law" on May 3, 201 [sic.] for "retainer replacement." Also, at least one of the Matichak settlement payments paid to my firm (the one also on May 3) was paid out of that account.

33

(A copy of Parker's email is attached hereto as Exhibit 27). Thus, Parker was aware that DeHaan was paying bills and personal expenses (including payments to Page Perry itself) out of the client funds in the Pass Through Account and that this had been misrepresented to the state auditor -- but his primary "concern" was that the auditor would "look very carefully" at the Pass Through Account and "seek additional information regarding its operation."

82.

But rather than correct the inaccurate description given to the auditor, inquire further about the Pass Through Account, or act to protect the interests of Lighthouse and its clients, Parker simply advised DeHaan that he should "not pay bills or other liabilities directly from this [Pass Through] account. That could amount to commingling." (*Id.*)

83.

Notably, as Parker's partner at Page Perry, Terry was copied on this email, and responded that it was "very odd" that DeHaan was paying personal bills and expenses from the Pass Through Account, and went on to observe: "Seems to be more than a 'pass-through account.' Wonder why it's there -- who suggested it be set up that way? Also, doesn't this constitute custody [of client funds]?" (A copy of Terry's email is attached as Exhibit 28).

34

84.

At that point, Parker attempted to help DeHaan cover up the suspicious Pass Through Account. On March 28, 2012, Parker emailed DeHaan to ask whether the Pass Through Account had any money in it, and when DeHaan responded that the account had a zero balance, Parker wrote:

> *Great! Then close the account and make sure nothing shows up on the 3/31 balance sheet under that category .... On the form ADV, I'll check that you do not have custody.*

(A copy of Parker's email is attached hereto as Exhibit 29) (Emphasis added).

85.

Thus, based solely on DeHaan's representation that the Pass Through Account currently had a zero balance, and without verifying any of the deposits or withdrawals from the account over the past 2 years, Parker simply advised DeHaan *to close the account and take it off the balance sheet* -- and Parker then reported to the regulators in the 2012 Form ADV that Lighthouse did *not* have custody of any client funds.

86.

The next day, on March 29, 2012, Parker and Terry emailed DeHaan to schedule a meeting for March 30, 2012. (A copy of Parker's email is attached hereto as Exhibit 30). In the email, Parker states that "Bob [Terry] and I have

sufficient information to meet without the need for you to bring any further records, but if you have records relating to the pass-through account readily available, please bring those with you."

87.

The next day, on March 30, 3012, the SEC issued a subpoena to DeHaan requiring his testimony on April 3, 2012. The matter was discussed by the partners at Page Perry, and it was agreed that the firm would represent Lighthouse in the SEC investigation, as long as it could pay a large retainer fee. On April 1, 2012, Parker wrote to DeHaan: "As I'm sure you know, this is not covered by your retainer. I have spoken to my partners about the nature of the representation, without sharing the details at this point, and I must request that you pay our firm's customary retainer of $20,000 for matters in this posture." (A copy of Parker's email is attached hereto as Exhibit 31). DeHaan paid the $20,000 retainer and Page Perry partners Terry and MacIntyre appeared with DeHaan on April 3, 3012 before the SEC -- where he again gave false testimony.

88.

A month later, on May 4, 2012, Parker filed Lighthouse's Form ADV -- in which he again falsely represented that Lighthouse did *not* have custody of any client funds.

36

**A Few Weeks Later, Page Perry Withdrew as Lighthouse's Counsel -- But First Provided Cover for DeHaan to Misappropriate Even More Money from Lighthouse's Clients**

89.

In May 2012, it became clear that the SEC and FBI would pursue civil and criminal charges against DeHaan.  In response, Page Perry drafted ***but did not send*** a withdrawal letter stating that it intended to withdraw because DeHaan had "repeatedly provid[ed] false information to us...[which] would hinder our ability to represent you effectively."  (A copy of the draft withdrawal letter is attached hereto as Exhibit 32).  The letter went on to assert that "[y]ou have also been advised numerous times by us about the implications of providing any false documents, false sworn testimony or other false statements to the SEC or the Secretary of State of Georgia."  (*Id.*)  Thus, Page Perry knew that DeHaan had provided false testimony and false documents and information to the SEC and the Georgia Securities Commissioner, but it did not withdraw at that point.

90.

Instead, on May 29, 2012, Page Perry advised DeHaan that the firm would require a retainer of $90,000 to represent him -- much higher than the typical retainer for this type of representation.  On information and belief, this retainer

37

included a premium because Page Perry was aware of DeHaan's fraudulent conduct.

91.

A week later, on June 5, 2012, Parker sent an email to DeHaan that said: "[w]e are going to have to withdraw from representing you if we have not received the $90,000 retainer by the end of today." (A copy of Parker's email is attached hereto as Exhibit 33).

92.

On June 11, 2012 and June 12, 2012, Parker and Terry again emailed DeHaan trying to collect the $90,000 retainer. (Parker and Terry's emails are attached hereto collectively as Exhibit 34). Shortly thereafter, DeHaan in fact paid the excessive $90,000 retainer to Page Perry.

93.

Nonetheless, on June 14, 2012, when it became clear that DeHaan would be prosecuted criminally and that Page Perry might be implicated in his fraudulent conduct, Page Perry finally withdrew.

94.

Within days, Page Perry went to the SEC and disclosed what it knew about DeHaan's misappropriation of funds from Lighthouse and its clients. However,

38

before disclosing this information, Page Perry sought (and obtained) consent *from DeHaan.*

95.

Notably, in May and June 2012, while Page Perry withheld information from the SEC and the Georgia Securities Commissioner and delayed in anticipation of being paid the $90,000 retainer fee from DeHaan, DeHaan pilfered approximately $2.5 million *more* from Lighthouse and its clients.

96.

In fact, in one massive scam in May 2012, DeHaan began raising money from Lighthouse clients for an entity he owned and controlled called the DeHaan Fund. Specifically, when FaceBook went public, DeHaan contacted Lighthouse clients and advised them that he had an allotment of $5 million worth of FaceBook stock from the underwriter as part of the Initial Public Offering ("IPO"). According to DeHaan, the DeHaan Fund could buy the FaceBook shares pre-IPO for a discounted price of $29 per share -- and when it went public, the shares would be worth $40 per share or more.

97.

On information and belief, Page Perry prepared the prospectus and other offering materials for the DeHaan Fund which DeHaan subsequently circulated to

investors, and was featured very prominently in the "pitchbook" for the FaceBook offering.  Indeed, the pitchbook contained an organizational chart for the DeHaan Fund which showed Page Perry in the flow chart as an integral part of the company -- in fact, in a very high, management level role *above* the employees of the company.  (A copy of the pitchbook is attached hereto as Exhibit 35).

98.

In reliance on DeHaan's fraudulent misrepresentations, five Lighthouse clients invested over $700,000 in the FaceBook IPO.

99.

In reality, DeHaan did not have a pre-IPO allotment of discounted FaceBook stock and he never intended to make any such investment with these investor funds.  Rather, he deposited the $700,000 into the Pass Through Account -- and used $90,000 of it to pay Page Perry's retainer for *his* legal fees in late May or early June 2012.  In addition, some of the money was used by DeHaan to purchase and make improvements to a house in Tennessee in an apparent effort to secure a luxury home for his family before he was prosecuted for securities fraud and wire fraud.

## COUNT I
## PROFESSIONAL MALPRACTICE

### 100.

The Receiver realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

### 101.

The Affidavit of Professor Mercer E. Bullard is attached hereto as Exhibit 36 and incorporated herein by reference, in accordance with O.C.G.A. § 9-11-9.1(a).

### 102.

Pursuant to the Retainer Agreement between the parties, Lighthouse was a client of Defendant law firm Page Perry from December 2008 through June 2012, during which time Page Perry was paid in excess of $228,000 for its legal services. Each of the individual Defendants was personally involved in providing legal services to Lighthouse.

### 103.

As such, Page Perry and the individual Defendants owed Lighthouse certain professional duties pursuant to Georgia law and the Georgia Rules of Professional Conduct ("GRPC") promulgated by the State Bar of Georgia.

41

104.

In addition, the GRPC establish the standard of care to be exercised by all attorneys in Georgia and sets forth the disciplinary and ethical rules that govern the conduct of all attorneys licensed to practice law in the State of Georgia.

105.

During the course of its 3 1/2 year representation of Lighthouse, Page Perry and the individual Defendants failed to meet minimum professional standards with respect to the legal services they provided by (1) failing to exercise reasonable care and diligence in evaluating the securities law compliance of Lighthouse; (2) failing to act in the best interest of Lighthouse by protecting DeHaan's interest instead, which was in conflict with Lighthouse's best interest; (3) failing to protect Lighthouse by willfully disregarding numerous red flags and obvious signs of fraud by DeHaan; (4) failing to prevent or report DeHaan's fraud despite clear evidence that DeHaan was violating the custody rule and stealing Lighthouse's client assets; and (5) ultimately aiding and abetting DeHaan's fraud, participating in the cover-up and receiving proceeds of the fraud.

106.

GRPC 1.13(b), entitled "Organization as Client", provides that if a lawyer for an organization knows that an officer of the organization is engaged in illegal

conduct that is likely to result in substantial injury to the organization, the lawyer must act in the best interest of the organization and report the matter to "the highest authority that can act on behalf of the organization as determined by applicable law."

107.

In this case, since DeHaan was the President of Lighthouse, the "highest authority" was the SEC or the Georgia Securities Commissioner. Accordingly, when Page Perry and the individual Defendants knew or should have known of DeHaan's fraud, each of them had a duty, in the best interest of their client Lighthouse, to report the fraud to the state or federal regulators.

108.

Page Perry and the individual Defendants not only failed to report DeHaan's fraud to the authorities, they treated DeHaan as their client, thereby protecting and even assisting him in his fraud against Lighthouse by helping DeHaan conceal his fraud from the public and from the regulators.

109.

Indeed, Page Perry and the individual Defendants only reported DeHaan's criminal misconduct after the firm withdrew from representing Lighthouse. According to public filings, Page Perry and the individual Defendants now claim

43

that they could not report DeHaan's fraud earlier because their communications with DeHaan were subject to attorney-client privilege and could not be disclosed.

110.

Furthermore, in May 2012, Page Perry and the individual Defendants sought and obtained DeHaan's consent before "self-reporting" his fraud and misappropriation of funds from Lighthouse and its clients.

111.

However, as Page Perry and the individual Defendants have repeatedly acknowledged, DeHaan was not their client. Indeed, the December 2008 Retainer Agreement expressly provides that: "Our client in this engagement will be Lighthouse Financial Partners, LLC (the "Company" or "you"). We will not represent any individual or other entity in this engagement." (*See,* Retainer Agreement, Exhibit 2 above).

112.

In addition, Page Perry's June 2012 withdrawal letter is addressed to DeHaan and specifically states that the firm is withdrawing from its representation of Lighthouse but that "we have never represented you and will not do so in this or any other matter." (*See,* withdrawal letter, Exhibit 32 above).

113.

Thus, since Page Perry and the individual Defendants acknowledge that they never represented DeHaan, his communications with them were not privileged -- and moreover, since they did represent Lighthouse, they were obligated under GRPC 1.13 to immediately report DeHaan's fraud against their client to the "highest authority" to protect the best interest of Lighthouse. Page Perry and the individual Defendants plainly violated GRPC 1.13 and breached their duties to Lighthouse by protecting DeHaan and even facilitating his fraudulent scheme against Lighthouse.

114.

In addition, GRPC 1.7 provides that a lawyer shall not represent a client if the representation involves a "concurrent conflict of interest" wherein the representation of one client would be "directly adverse" to that of another client. Recognizing the potential conflict between DeHaan and Lighthouse, Page Perry's Retainer Agreement expressly provides that if the firm is called upon to represent any individual in relation to this matter, such representation would require "formal waivers of potential conflicts." (*See,* Retainer Agreement, Exhibit 2 above).

115.

Page Perry and the individual Defendants also violated GRPC 1.7 when they agreed to represent DeHaan and Lighthouse in the SEC investigation, since DeHaan was being investigated for misappropriating funds from Lighthouse. This clearly created a "concurrent conflict of interest."

116.

Page Perry and the individual Defendants also breached the professional standard of care in their representation of Lighthouse by ignoring countless red flags that alerted them or should have alerted them to DeHaan's fraud.

117.

For instance, Page Perry and the individual Defendants knew that Lighthouse was prohibited from taking custody of its client's money or securities, yet they were aware of the "Client Holding - Pass Through" Account since at least January 2011 -- and knew that the Pass Through Account held client funds and had a negative balance of approximately $800,000 at that time.

118.

Furthermore, Page Perry and the individual Defendants knew in 2010 that the Quantplat software being made available to clients contained self-generated account information manually inputted by DeHaan -- and that this account

information was not integrated with the broker-dealer firms that purportedly had custody of the client accounts and thus was totally unverifiable. In addition, Page Perry and the individual Defendants knew for years that Lighthouse clients were not receiving monthly account statements from Interactive Brokers or TD Ameritrade and thus, the account information that DeHaan was *creating* on the Quantplat software was the *only* account information that Lighthouse's clients were receiving.

119.

Page Perry and the individual Defendants also failed to exercise reasonable diligence and professional skill by ignoring and taking no steps to correct these glaring deficiencies, even though the same deficiencies showed up year after year in the mock audits. The purpose of a mock audit is to identify, and recommend corrective action, as to securities compliance deficiencies and to prepare a firm for an actual inspection by regulators. A mock audit typically covers a wide range of compliance issues, but custody compliance is the single most important area of review because violation of custody rules is the single greatest fraud risk that investment advisory activities entail. Indeed, custody of client assets, especially highly liquid financial assets such as the cash that was stolen in this case, presents advisory clients' greatest vulnerability to fraud. Thus, a properly conducted mock

audit should make custody compliance its primary focus and lead to immediate and aggressive action upon discovery of custody deficiencies.

120.

However, Page Perry and the individual Defendants showed no concern about correcting the deficiencies until the Commissioner conducted the books and records inspection.   On the contrary, Defendants' sole concern seemed to be passing the state audit, rather than actually correcting the deficiencies or preventing the fraud.   Indeed, DeHaan's fraudulent scheme would still be continuing today if the Commissioner's office had not discovered the misappropriation, shut down Lighthouse and arrested DeHaan.

121.

Moreover, with full knowledge of all of these regulatory violations and material improprieties, Page Perry and the individual Defendants lent credibility to DeHaan's fraudulent enterprise by continuing to make their presence highly visible as an integral part of Lighthouse's operations, thus helping DeHaan to garner trust and confidence with Lighthouse's clients.   Indeed, Page Perry was not only featured prominently in the FaceBook offering materials, the individual partners of Page Perry routinely attended client parties and other "dog and pony shows", at which they met Lighthouse clients, handed out their business cards, and

discussed their role as compliance counsel for Lighthouse.  And Page Perry and the individual Defendants at all times touted their reputation as a "pro-investor" law firm and boasted that they had long been known for representing "victimized investors" against dishonest and fraudulent brokers and financial advisers.

122.

As a direct and proximate result of Page Perry and the individual Defendants' multiple breaches of their professional duty to Lighthouse and violations of multiple Rules of the GRPC, Lighthouse suffered substantial harm.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**

123.

The Receiver realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

124.

Pursuant to Georgia law, Page Perry and the individual Defendants owed Lighthouse a fiduciary duty "to exercise the utmost good faith, to apply [their] best skill, zeal, and diligence in representing [it], and to avoid interests or actions that were incompatible with [the client]'s." *Tunsil v. Jackson,* 546 S.E. 2d 875, 878 (Ga. App. 2001); *Tante v. Herring,* 453 S.E. 2d 686 (Ga. 1994). Moreover,

49

as securities counsel for Lighthouse, Page Perry and the individual Defendants had a duty to act solely in the best interest of its client, and to protect Lighthouse from any misconduct by an officer of the corporation that would likely cause "substantial injury" to Lighthouse. *Paul v. Smith, Gambrell & Russell,* 599 S.E. 2d 206, 209 (Ga. App. 2004).

125.

Page Perry and the individual Defendants breached their fiduciary duty to Lighthouse by treating DeHaan as their client and putting his interest above that of Lighthouse, thereby protecting DeHaan rather than Lighthouse and facilitating and participating in his fraud against Lighthouse, as fully set forth above.

126.

As a direct and proximate result of Page Perry and the individual Defendants' multiple breaches of their fiduciary duty, Lighthouse suffered substantial harm.

## COUNT III
## BREACH OF CONTRACT

127.

The Receiver realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

50

128.

Page Perry's conduct set forth above also constitutes a breach of its duties and obligations under its Retainer Agreement with Lighthouse.

129.

Specifically, the legal services expressly identified in the "Scope of Engagement" under the Retainer Agreement include: "To advise the Company [Lighthouse] regarding all registration, licensing and regulatory requirements, including, as applicable, the requirements of the Securities and Exchange Commission and all state securities and investment advisor regulators." (*See,* Retainer Agreement, Exhibit 2 above).

130.

Page Perry's contractual duties under the Retainer Agreement clearly included all issues related to "custody" of client funds and accounting therefor. Indeed, Page Perry was retained to advise on all regulatory requirements -- and custody of client funds is the single most important regulatory issue for an RIA.

131.

Moreover, Page Perry in fact addressed the custody issue throughout its representation of Lighthouse.  For example, shortly after being retained, one of the first things Page Perry did for its new client was to correspond with the

Securities Commissioner for guidance on a new "custody" rule that was being implemented to determine how the new rule would affect Lighthouse.

132.

Page Perry also undertook to advise Lighthouse with regard to the custody issue on at least a dozen occasions in 2009, 2010, 2011 and 2012. Page Perry also addressed the custody issue in connection with its filing of Lighthouse's Form ADV in 2009, 2010, 2011 and 2012, and reviewed Lighthouse's financial records in connection with the Mock Audits in 2010 and 2011 as well as the Commissioner's audit in 2012.

133.

Page Perry breached the Retainer Agreement by failing to properly advise Lighthouse with respect to the numerous regulatory violations by DeHaan, failing to address the material regulatory deficiencies it discovered or should have discovered in the mock audits, and failing to act in Lighthouse's best interest with respect to known regulatory violations and other misconduct by DeHaan, all to Lighthouse's detriment.

134.

Lighthouse suffered substantial harm as a direct and proximate result of Page Perry's multiple breaches of its contract with Lighthouse.

## COUNT IV
## RESPONDEAT SUPERIOR/NEGLIGENT SUPERVISION

### 135.

The Receiver realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

### 136.

On information and belief, at all times relevant hereto, Defendants Parker, Terry and MacIntyre were either junior partners or "of counsel" to Defendant Page Perry and acted as agents, servants and/or employees of Page Perry.

### 137.

Defendants Parker, Terry and MacIntyre at all times acted within the course and scope of their employment in connection with their legal representation of Lighthouse and in furtherance of Page Perry's business. Accordingly, Page Perry and Defendants Page and Perry, as the senior partners of the firm, are vicariously liable in respondeat superior for the acts of Defendants Parker, Terry and MacIntyre in the course of their employment.

### 138.

In addition, as the senior partners of Page Perry, Defendants Page and Perry had a duty to supervise the junior partners and/or "of counsel" attorneys. Page

Perry and Defendants Page and Perry failed to adequately supervise Defendants Parker, Terry and MacIntyre.

139.

As a direct and proximate result, the Receiver and the Investors suffered substantial harm.

**COUNT V**
**PUNITIVE DAMAGES**

140.

The Receiver realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

141.

Page Perry and the individual Defendants' actions in repeatedly protecting and shielding DeHaan, aiding and abetting his fraudulent scheme against Lighthouse and the Investors, failing to make any effort to correct the known deficiencies and regulatory violations by DeHaan that made it possible for him to commit this fraud, making willfull misrepresentations and omissions of material facts to the Investors, and consistently failing to act in the best interest of Lighthouse were undertaken in bad faith or with conscious indifference to the consequences. Accordingly, the Receiver and the Investors are entitled to recover

54

punitive damages against the firm and the individual Defendants in an amount to be determined by the enlightened conscience of the jury.

## COUNT VI
## ATTORNEYS' FEES

142.

The Receiver realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

143.

In this action, Page Perry and the individual Defendants are asserting defenses that lack substantial justification, are frivolous and substantially groundless.

144.

In this action, Page Perry and the individual Defendants have denied claims as to which there is a complete absence of any justiciable issue of law or fact.

145.

Page Perry and the individual Defendants have also acted in bad faith, have been stubbornly litigious, and have caused the Receiver and the Investors unnecessary trouble and expense.

146.

Accordingly, the Receiver is entitled to recover his attorney's fees and expenses of litigation pursuant to O.C.G.A. § 9-15-14 and O.C.G.A § 13-6-11.

WHEREFORE, Plaintiff seeks the following relief against Defendants, jointly and severally:

(a)     compensatory damages in an amount, not less than $5 million, which is sufficient to compensate Plaintiff for all losses and damages sustained by Lighthouse as a result of Defendants' multiple breaches of duty set forth herein;

(b)     disgorgement of all legal fees received by Defendants in connection with their representation of Lighthouse;

(c)     punitive damages in an amount to be determined at trial;

(d)     all costs and expenses of this litigation, including court costs and reasonable attorney's fees, pursuant to O.C.G.A. § 9-15-14 and O.C.G.A. § 13-6-11; and

(e)     such other and further relief as the Court deems just and proper.

56

This 25th day of November, 2013.

Respectfully submitted,

DOVIN MALKIN & FICKEN LLC

/s/_____
Edward J. Dovin
Georgia Bar No. 227645

/s/_____
Allison S. H. Ficken
Georgia Bar No. 355875

Attorneys for Plaintiff

Five Concourse Parkway
Suite 277
Atlanta, Georgia 30328
(770) 829-3869 - phone
(770)829-3865 - fax

## CERTIFICATION AS TO FONT AND POINT SELECTION

In accordance with LR 7.1(D), the undersigned hereby certifies that this

COMPLAINT AND JURY DEMAND was prepared using Times New Roman

14-point, a font and point selection approved by the Court in LR 5.1(C).

This 25th day of November, 2013.

/s/_____

Allison S. H. Ficken
Georgia Bar No. 355875

Attorneys for Plaintiff

Five Concourse Parkway
Suite 277
Atlanta, Georgia 30328
(770) 829-3869 - phone
(770)829-3865 - fax