IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

SECURITIES AND EXCHANGE COMMISSION,
    Plaintiff,

v.

BENJAMIN DANIEL DEHAAN and
LIGHTHOUSE FINANCIAL PARTNERS, LLC,
    Defendants.

Civil Action File No.
1:12-CV-1996-TWT

---

S. GREGORY HAYS, Receiver for
LIGHTHOUSE FINANCIAL PARTNERS, LLC,
    Plaintiff,

v.

PAGE PERRY, LLC, ESTATE OF
J. BOYD PAGE, ALAN R. PERRY, JR.,
J. STEVEN PARKER, ROBERT D. TERRY,
and DANIEL I. MACINTYRE,
    Defendants.

Ancillary Proceeding
No. 1:13-CV-03925-TWT

---

### *CORRECTED* BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT AGAINST DEFENDANTS PAGE PERRY, LLC, J. STEVEN PARKER AND ROBERT D. TERRY

    Lighthouse Financial Partners LLC was a registered investment advisory

firm operating a Ponzi scheme. Benjamin DeHaan, Lighthouse's now imprisoned

11053504

former CEO, masterminded and perpetrated the scheme by operating Light-house as his alter ego.  [Compl. ¶1; *SEC v. DeHaan*, et. al., Case No. 1:12-CV-1996-TWT (N.D. Ga. Jun. 9, 2012), Doc. 1].[1]  As is shown in Plaintiff's Complaint and Exhibits, he was able to hide the Ponzi scheme from his attorneys, the Defend-ants in this case, by repeatedly lying to them and forging and hiding documents.

On July 2, 2012, Plaintiff S. Gregory Hays was appointed Lighthouse's Re-ceiver.  The appointing order authorized him to file lawsuits on Lighthouse's be-half.  As DeHaan is penniless, Hays has elected to ignore his paramount role in the fraud.  Instead, he faults (in hindsight) Lighthouse's former law firm, Page Perry, LLC, for:  (i) failing to discover Lighthouse's fraud sooner than it did; and (ii) failing to report the fraud to the regulators sooner, and without Lighthouse's permission.  The Complaint seeks to foist extraordinary new duties on a lawyer

---

[1] In deciding this Motion to Dismiss, the Court may consider materials in addi-tion to Hays's Complaint when those materials are (1) central to the plaintiff's claim and (2) their authenticity is not challenged.  *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).  Here, Page Perry, LLC, J. Steven Parker and Robert Terry (col-lectively "Page Perry") rely on the exhibits Hays attached to his Complaint and certain public filings from the Securities and Exchange Commission's enforce-ment action against DeHaan, which is styled:  *Securities and Exchange Commission v. Benjamin Daniel DeHaan et al.*, civil action no. 1:12-cv-01996-TWT (N.D. Ga. 2012) (the "SEC Action").  The importance of considering these documents can-not be overstated: they repeatedly and directly contradict the stunning number of false or misleading allegations contained in Hays's Complaint.

11053504

where none exist—namely, the duties to conclude definitively the existence of fraud from alleged red flags without proof and, again without proof, to report the suspected fraud to regulators in violation of the attorney-client privilege.

Hays compounds the injustice he seeks to inflict on Defendants by ignoring: Page Perry's diligence in actually uncovering key elements of Lighthouse's scheme; convincing Lighthouse to turn itself in to the regulators once the fraud was discovered; and convincing Lighthouse to segregate hundreds of thousands of dollars of purloined assets for the defrauded investors, and Hays's benefit. In fact, to date almost all the assets the Receiver claims to have "recovered" for the benefit of the receivership estate, including $660,000 in cash and the proceeds of the sale of a house in Memphis, Tennessee, are assets that Defendants arranged to be turned over to a fund for defrauded investors before Hays was ever appointed.  Most of these assets have gone to pay the Receiver's fees.

The basic allegations in the Complaint are outrageous in that they deliberately attempt to turn Page Perry's actions upside down.  Page Perry scrupulously documented the instances where it notified Lighthouse's management about the company's compliance deficiencies and implored their remediation.  Indeed, Hays's Complaint attaches a collection of these documents as exhibits—

including the minutes of a meeting where Lighthouse's senior employees, at Page Perry's urging, agreed to remedy the company's violations. [Compl. Ex. 16].

Hays complains that Page Perry "failed to report DeHaan's fraud to the authorities" and seeks to hold Page Perry liable for that. [Compl. ¶108]. The Complaint omits, however, that Page Perry complied fully and scrupulously with Georgia law by taking the actions it did, *which included convincing Lighthouse to turn itself into the authorities.*[2]

When an organization's lawyer learns that a company constituent is acting in "violation of a legal obligation to the organization" or in "violation of law that reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization," the lawyer must notify the organization's senior management—which, in this case was, of course, DeHaan. [Georgia Rule of Professional Conduct 1.13]. But the law only permits (and never obligates) an organization's lawyer to disclose client confidences. [Rule 1.13(c)]. Citing the same rule, Hays somehow alleges that Defendants "had a duty, in the best interest of their client Lighthouse, to report the fraud to the state or federal regulators." [Compl. ¶107]. Hays's construction of this "duty" from whole cloth is a

---

[2] Coincidentally, this also implicated DeHaan and led to his imprisonment. Yet, and without any specific allegation as to how, the Complaint alleges that the Defendants favored DeHaan over Lighthouse.

deeply flawed attempt to take an attorney's ethical disclosure obligations where they have never gone before.

Going one step further, Hays incorrectly faults Page Perry for "taking no steps to correct [Lighthouse's] glaring [compliance] deficiencies."  [Compl. ¶119]. In fact, as Hays's own Complaint clearly establishes, Page Perry repeatedly urged Lighthouse to comply with the laws and regulations applicable to its business, most notably the regulations designed to prevent an adviser from being in a position to steal from its clients.  Further, when Page Perry detected deficiencies during the course of its representation, it urged Lighthouse to correct them.  No authority has ever obligated a lawyer to somehow **force** his client to fix identified problems for good reason: a lawyer cannot force clients to follow his advice.  Instead, lawyers can only identify problems, prescribe solutions, and encourage clients to follow those solutions.  That is precisely what Page Perry did here.

In sum, the Court should dismiss Hays's lawsuit because the Complaint itself demonstrates that Page Perry breached no legal duties in representing Lighthouse.[3]

---

[3] These Defendants incorporate by reference any and all grounds that are raised in the Motion to Dismiss Defendants Page, Perry and MacIntyre and that are applicable to their defense motion.

**ALLEGATIONS OF THE COMPLAINT**

More than a year after founding Lighthouse, DeHaan executed a retainer agreement to hire Page Perry to represent Lighthouse in connection with certain specified matters.  [Compl. ¶34, Ex. 2].  Consistent with Rule 1.2 of the Georgia Rules of Professional Conduct, that agreement details the scope of Page Perry's representation.  Namely, the firm neither "serve[d] as [Lighthouse's] General Counsel" nor would it "make independent inquiry or investigation without specific request."  [*Id*.][4]  Instead, Page Perry spelled out five services it would provide.  The first service was to "advise the Company regarding all registration, licensing and regulatory requirements . . . [including] drafting, reviewing, advising as to the content and form of all documents required to be filed by said regulators including Form ADV."  [*Id*. ¶36, Ex. 2].

---

[4] Plaintiff's expert opined that Page Perry should have done what the State Commissioner of Securities did.  [Compl. Ex. 36, ¶14].  But Lighthouse never requested Page Perry to investigate the location of client funds and, under the agreement Page Perry was not obligated to do so.  Furthermore, the Commissioner has subpoena power under O.C.G.A. § 10-5-71(b), and therefore **can require** regulated custodians to answer their questions.  By contrast, custodians can, and it is undisputed in this case do, refuse to answer questions posed by lawyers.  [*See* Compl. ¶60 and Exs. 14, 16].

**A.      Page Perry Repeatedly Gave Lighthouse Advice That, If Followed, Would Have Prevented Or Revealed Lighthouse's Fraud.**

Of all the Complaint's egregious distortions, the worst is Hays's allegation that Defendants did nothing to prevent DeHaan from committing fraud.  [*See e.g.*, Compl. ¶¶38, 42, and 105].  Hays draws this conclusion only by alleging non-existent facts and urging impermissible inferences from documents directly contradicting his contentions.

First and foremost, DeHaan was only able to steal from his clients because he received client checks made payable directly to Lighthouse.  [*See* Compl. ¶¶24, 99].  But on March 14, 2011 Defendants sent the following email to Lighthouse:

> I re-checked the Georgia custody rule.  You can receive checks made payable to "third parties," but not checks made payable to you.  If you receive checks made payable to Lighthouse, you still do not have custody if you return them within 3 business days.
>
> **You should return the check ASAP and get a replacement payable to [Interactive Brokers].**  (Emphasis added).[5]

[Compl. Ex. 10].

---

[5] Hays omitted this last sentence from the quoted portion of the email in paragraph 52 of the Complaint, since it demonstrates that Defendants actually advised Lighthouse that it couldn't accept checks made payable to Lighthouse.

Defendants thus advised Lighthouse it could only accept checks made payable to its custodian. And if Lighthouse had never accepted client checks or wires payable to itself, DeHaan could not have stolen client funds.  <u>Thus, DeHaan was only able to commit fraud by secretly defying the Defendants' advice</u>.

Hays dodges the above-quoted e-mail's plain meaning by alleging Defendants are "counseling DeHaan as to how to avoid detection by the regulators."  [Compl. ¶52].  *Ashcroft v. Iqbal* provides, however, that the Court is not required to accept Hays's illogical, unsupported inference from a document whose opposite but true meaning is plain on its face.  556 U.S. 662, 677 (2009).

Exhibit 24 to Hays's Complaint provides another example where Defendants advice, had it been followed, would have prevented DeHaan's fraud.  There, Defendants advise Lighthouse via email on June 15, 2011:

> It is imperative that, for each customer, you have a "reasonable basis to believe" the customer receives account statements directly from the custodian at least quarterly.  Practically speaking, **this means you should confirm this fact with every different custodian, and place the confirming information in your custody file.**  The consequences of not doing that are having to send (push or mail) a quarterly statement to each client and subject yourself to a costly surprise audit. Getting confirmation from the custodian is easier and cheaper.

[Compl. Ex. 24 (emphasis added)].   The email further advised that it "would probably be a good practice for you to receive electronic copies of the statements (static) provided to customers."[6] [*Id*.].

Second only to advising a client not to accept checks payable to itself, the advice contained in the above-email is the most important advice a lawyer could give a client to prevent fraud.   Indeed, in adopting the SEC custody rule on which the Georgia rule is patterned and on which Defendants' advice is based, the SEC said:

> [T]he adviser must have a reasonable basis for believing sends an account statement, at least quarterly, to each client for which the qualified custodian maintains funds or securities.   The requirement is designed so that advisory clients will receive a statement from the qualified custodian that they can compare with any statements (or other information) they receive from their adviser to determine whether account transactions, including deductions to pay advisory fees, are proper.

[17 CFR Parts 275 and 279; Release No. IA-2968; File No. S7-09-09].

Exhibit 24 was therefore designed to keep Lighthouse out of a position susceptible to fraud, or at least to enable Lighthouse clients to detect any fraud

---

[6] The "reasonable basis" standard comes directly from Georgia Rule 590-4-4-.20. When the SEC adopted a similar rule it specifically said that advisers need not actually obtain copies of client statements. 17 CFR Parts 275 and 279 [IA Release 2968].   Thus, Defendants were actually advising its client to do more than the bare minimum the rule requires when it advised Lighthouse to collect copies of the statements. During this time, predecessor Rule 590-4-8-.16 was in force.

that was being committed.  If Lighthouse had followed Page Perry's advice and ensured Bank of America, as custodian of the client funds in the Pass Through account, sent statements to Lighthouse's clients then the fraud either could not have been committed or would have been detected by clients.  Because of the exhibit's plain meaning, Hays alleges that Page Perry's advice was a ruse or sent tongue-in-cheek.  [*See* Compl. ¶69 ("Parker knew that Lighthouse's clients were not receiving account statements from Interactive Brokers . . . .")].  Here, where the document itself reflects the motive—the delivery of sound advice for salutary purposes—Hays's nonsensical explanation for the email cannot be inferred.  *See Iqbal,* 556 U.S. at 677.

Exhibit 16 to the Complaint provides yet another clear example of Defendants counseling Lighthouse in a way designed to prevent DeHaan's fraud. There, in minutes to a meeting dated October 4, 2011, Defendants explain that Lighthouse's marketing materials "routinely contain errors" and urged their correction.  [Compl. Ex. 16, p. 1].  Among these error-laden materials, Defendants identified a "pitch book," created by Lighthouse for use with a private fund it was seeking to create, and recommended that it not be used.  The minutes reflect that the pitch book was "scrapped."  [*Id.*]  Notwithstanding the Defendants' ad-

11053504

vice, and contrary to Lighthouse's assurances, Lighthouse later used a similar pitch book to steal money from its clients.[7]  [*See* Compl. ¶¶ 95-99].

In turn, Defendants' March 2012 advice regarding Lighthouse's Pass Through account, which Hays denounces as advice designed to cover up criminal fraud, would have actually *prevented* DeHaan's fraud or, at least, strongly facilitated its detection—again, had the advice been followed.  Leading up to Defendants' March 2012 advice, DeHaan concealed his fraud from Defendants by ignoring Defendants' requests, during Lighthouse's 2011 mock audit, for Lighthouse's financial records.  [Compl. Ex. 11 (Page 3 of Letter from J. Steven Parker to Lighthouse Financial Partners (Aug. 30, 2011)].  Although Defendants had no tools with which to force Lighthouse to comply with their requests, they noted Lighthouse's failure to produce its financial statement and general ledger as a deficiency in the November 18, 2011 Mock Audit Report.  [Compl. Ex. 19, p. 6].

In early 2012, however, Lighthouse was faced with similar requests from the Georgia Secretary of State—who, unlike a private attorney, is equipped with tools to force advisory companies to comply with document requests—which forced Lighthouse to produce its financial documents.  With those documents in

---

[7] Elsewhere in the Complaint (¶97) Hays alleges, contrary to Exhibit 16, and without factual basis, that Defendants *actually prepared* the pitch book.

hand, the state regulators questioned Lighthouse about one balance sheet entry known as "Client Holding – Pass Through."  [Compl. Ex. 25 (e-mail from Marcella Mitchell to Benjamin DeHaan and Catherine Hardison (Feb. 16, 2012 (3:19 PM))].  In response, Lighthouse agreed to provide a restatement of the balance in that account, but explained that the Pass Through account was established at Lighthouse's bank and contained customer funds.  [SEC v. DeHaan, Marcella Mitchell Decl., Ex. C (Doc. 9-4) (Joint Appx. Ex. 1)].[8]

In light of Lighthouse's production of its records, Defendants were able to review the ledger and noticed unusual transactions contained in the Pass Through account. [Compl. Ex. 27]. Defendants responded by advising Lighthouse to "close the account," and to have the "**account audited**" by "mid April." [*Id.* Ex. 29 (emphasis added)]. Of course, had Lighthouse followed Page Perry's advice, the audit would have revealed Lighthouse's fraud.[9]

---

[8] Hays's repeated assertion that Lighthouse never reported to regulators that it had custody is false: when the Pass Through entry was questioned by regulators, Lighthouse responded with a letter clearly admitting custody. [Mitchell Decl., Ex. C (Joint Appx. Ex. 1)].

[9] Going one step further, Page Perry arranged a meeting with DeHaan on March 29, 2012, and requested that he make available all records related to the "Pass Through Account." [Compl. Ex. 30]. Incredibly, despite Defendants' unheeded request for all of the account records, Hays falsely alleges Defendants did not attempt to verify the "deposits or withdrawals from the account." (Cf. Compl. ¶85 and Ex. 30).

Incredibly, Hays ignores Defendants' multiple urgings to have the account audited and focuses, instead, on Defendants' advice to close the account. But, that advice was also salutary, particularly if (as was unknown to Defendants) it was being used to steal client funds. Further, since DeHaan informed Defendants on March 28, 2012 that the account had nothing in it since February, Defendants' advice that nothing should show up on the March 31 balance sheet was a mere truism, not a sinister suggestion to "take it off the balance sheet," as Hays contends.[10]  [Compl. ¶85, Ex. 29].

In short, Defendants' March 2012 advice did not advise Lighthouse to remove the entry on the December 2011 quarterly balance sheet, when there was an actual balance in the account.  Instead, Defendants urged Lighthouse to audit the account to ensure that the present balance was accurately stated to regulators—who were already aware of the account.  [Compl. Ex. 29; Mitchell Decl., Ex. C (Joint Appx. Ex. 1)].  Hays's conclusory implication of a "cover-up" in paragraph 84 is simply preposterous.

---

[10] Hays is an accountant by trade, yet he fails to explain how an account that had a zero balance in February and is closed in March should in fact be shown as having a positive balance on a March 31 balance sheet.

**B.    The Complaint Contains Many Other False Or Fantastic Allegations That Are Contradicted By The Record Or Not Supportable Inferences.**

1.    <u>Defendants did not make any misrepresentations in filings</u>.

The Defendants did not, as Hays contends, make false statements in a Form ADV. In fact, nowhere does the Complaint allege that Page Perry signed any ADV certifying its correctness.[11]  All Page Perry did was take the ministerial steps of completing the online forms for its client based on information given to it by its client, some of which turned out to be false.

Registered investment advisers are required to file Form ADV once per year to report aspects of its business to its regulator – here the Georgia Secretary of State. The form must be filed within 90 days of the end of an adviser's fiscal year end, which in Lighthouse's case was each March 31. [Georgia Secretary of State Rule 590-4-4-.02 (4)(C).]

After Defendants were first retained to assist Lighthouse in filling out its Form ADV properly, Parker asked DeHaan whether Lighthouse had custody of client funds. [Compl. ¶39, Ex. 3]. DeHaan responded to Parker that Lighthouse "never [takes] custody of client funds" because although clients "have written

---

[11] This is not a pleading defect that Hays could cure, because Lighthouse's President DeHaan signed each and every one of the ADV forms that Hays claims contains false statements, and Defendants did not sign any of them, a fact that is well known to Hays.

checks to [L]ighthouse in the past, . . . [DeHaan] signed them over to the custodian bank." [*Id*.][12]  DeHaan also represented to Parker that he would no longer accept client checks even for that limited purpose of forwarding them to the custodians. [*Id*.] Based on DeHaan's statement, Defendants helped Lighthouse fill out its Form ADV by checking that Lighthouse did not have custody as of March 31, 2009.

In one of his many sleights of hand, Hays implies that DeHaan's statement to Parker that Lighthouse did not have custody was false because, "[i]n fact, on September 10, 2009 DeHaan opened an account with Bank of America in Lighthouse's name, which gave Lighthouse 'custody' of client funds." [Compl. ¶41]. But this happened six months *after* DeHaan's affirmative statement that Lighthouse did not have custody. Defendants could not have and should not have reasonably anticipated that DeHaan would later do secretly what he had expressly told Defendants he would not do. [*Id*].

---

[12] The fact that Lighthouse had forwarded to the custodians all checks previously received meant, in fact, that Lighthouse did not have custody of client funds at the time of Parker's question or the date the ADV was filed. Hays does not allege that DeHaan's statement that he had done so with respect to all prior checks was false. In either event, Defendants had no reason to doubt the statement.

2.    Defendants did not "know" in 2011 that Lighthouse was stealing.

Hays's Complaint repeatedly alleges that Defendants "knew" or "were aware" that Lighthouse was using this Pass Through account to misappropriate client funds. [Compl. ¶42]. He constructs this argument because Defendant Parker received, on or about January 30, 2011, draft financial statements for Lighthouse for calendar year 2010, and the balance sheet reflected as an offset against liabilities an entry labeled "Client Holding – Pass Through." [*Id.* Ex. 5, p. 2]. According to the Complaint, this should have alerted Defendants that Lighthouse owed its clients over $800,000. [Compl. ¶¶46, 52, 70; Ex. 36, ¶13 (where Plaintiff's purported expert, Mercer Bullard, says this entry on the balance sheet was "direct evidence" that Lighthouse was stealing)].[13]

Hays's allegation is not credible. The balance sheet and accompanying email cannot reasonably lead to the inference Hays draws. Indeed, both the SOS and the SEC received and reviewed that same balance sheet and asked questions about that entry, yet *neither* of them concluded from that entry that Lighthouse

---

[13] Hays attempts to make the balance sheet appear nefarious by alleging that Lighthouse "mysteriously" sent Defendants "revised financial statements" "in response" to questions by the Defendants. The so-called revised financial statements, however, were not sent in response to those questions but were, in fact, sent to Defendants approximately nine months later. Hays thus again misleads the court by attaching only the revised financial statement without its accompanying email establishing the date they were sent.

was stealing client funds. [*Id.* Ex. 25]. In particular, the SOS asked Lighthouse to explain the entry in an e-mail dated February 16, 2012 [*Id.* Ex. 25 (e-mail from Marcella Mitchell to Catherine Hardison and Benjamin DeHaan (Feb. 22, 2012 (3:30 PM))]. In response, Lighthouse explained in writing that the Pass Through account was one into which client funds were deposited. [Mitchell Decl., Ex. C (Joint Appx. Ex. 1)]. Similarly the SEC became aware of the Pass Through account on March 14, 2012 when Marcella Mitchell of the Secretary of State forwarded the pass through explanation to them. [*Id*].

It is axiomatic that if this was direct evidence of stealing, either regulator would have acted to shut Lighthouse down as soon as it learned of it. Yet neither regulator filed a lawsuit or took enforcement action for almost four months after the SOS learned of the Pass Through account.  Indeed, the first time they became aware that the Pass Through account was being used to perpetrate a fraud was when Defendants informed Peter Diskin of the SEC of what Defendants themselves discovered shortly before May 30, 2012: actual misappropriations from the account by DeHaan. [Peter Diskin Decl., ¶9 (SEC Action) (Doc. 9-7) (Joint Appx., Ex. 2)]. The SEC's lawsuit was filed about a week later. [Compl. ¶28].

There are plenty of reasons why the balance sheet is not the kind of "smoking gun" that Hays claims. If the "approximately $800,000" in fact represented a

liability of Lighthouse to its clients, as Hays contends, it would have appeared as a positive number in the liability section of the balance sheet, as all of Lighthouse's other liabilities do. However, the "obvious evidence" is not a positive number, but is a negative number, -$752,494.96.   A negative number shown in the liabilities section in the balance sheet is not a liability but is, in fact, an offset against liabilities—a reduction of liabilities, not an increase. Parker is not an accountant, and is not held to a standard of being able to spontaneously analyze accounting information, much less something as abstract as a negative number appearing in a balance sheet listing of liabilities.  Hays's contention that the balance sheet entry should have sent Mr. Parker running to law enforcement to violate his ethical obligations and turn in his client is obviously implausible and incorrect.

Additionally, the line item on the balance sheet labeled "Client Holding – Pass Through" is not the same thing as a bank account labeled "Pass Through." Indeed, the same draft balance sheet [Compl. Ex. 5, p. 2] shows the *bank account* that is called "Pass Through" had a positive balance of $4,263.92.[14] The word

---

[14] Thus when Hays alleges that the "draft Balance Sheet showed an $800,000 negative balance in the 'Client Holding – Pass Through' Account," he commits three errors, whether or not deliberately. The only "account" on the balance sheet merely said "Pass Through," not "client," and contained just over $4,000. The

"client" is not present. In the accompanying email, Lighthouse's accountant re-
fers to this bank account and nowhere refers to it as a client account or contain-
ing client money. [Compl. Ex. 5, p. 1]. Thus, to the extent Defendants were made
aware of such a Pass Through account, no facts indicate they had reason to as-
sume that account ever contained any client funds.

　　Further, as lawyers, Page Perry attorneys were neither trained nor qualified
to evaluate a financial statement's accuracy or to deduce a nefarious purpose of
the "Pass Through Account" from its name alone. Mallen & Smith, *Legal Malprac-
tice* § 25.3 at 785 (2007). And it would have been preposterous for Page Perry (or
anyone without accounting training) to have attempted that undertaking since
Lighthouse's accountant—the professional qualified to "express an opinion on
the financial statements"—had prepared the draft financials. [See 1 American In-
stitute of Certified Public Accountants. AICPA Professional Standards § 110.03 at
61 (June 1, 2001) ("The auditor's responsibility is to express an opinion on the fi-
nancial statements.")].  Instead, Page Perry's role was to protect Lighthouse's le-
gal interests. [Ga. Rules of Prof'l Conduct pmbl. ¶ 2 (The lawyer's role is to "pro-

---

"Client Holding – Pass Through" entry was not associated with any bank "ac-
count," and it was positive, not negative.

vide[] a client with an informed understanding of the client's legal rights and obligations")].

Even assuming *arguendo* that Defendants had such qualifications and somehow concluded from the balance sheet entry that a pass through account existed that held client funds, there would have been no reason to believe from that 2010 draft balance sheet that the particular account was not maintained at a qualified custodian or that any funds were missing. It is not illegal for an adviser to hold client funds in an account in his own name at a qualified custodian. In fact Georgia Securities Rule 590-4-4-.20 provides that client funds may be maintained "in accounts that contain only the investment adviser's clients' funds and securities, under the investment adviser's name as agent or trustee for the clients. . . ."  Consequently, Hays's allegation that under "Georgia securities regulations in effect prior to 2011 . . . each client must have a brokerage account opened in his own name" is inaccurate.  [Compl. ¶13].  That an adviser holds customer funds in that way means that it must comply with applicable custody rules, but it does not mean that the adviser is a thief.

Yet another example of Hays misrepresenting the facts occurs in paragraph 81, in which he alleges that Defendant Parker "was aware that DeHaan was paying bills and personal expenses . . . out of the client funds in the Pass

Through Account . . . ." (emphasis added).  But once again Hays omits a critical portion of the email in order to mislead the Court.  Specifically, in the sentence immediately after the quoted portion of Exhibit 27, Mr. Parker says, "Now I assume that was your money, from your personal account, and that money just passed through.   Correct me if I'm wrong."  *Iqbal* does not permit an inference that Parker knew DeHaan was using client funds to pay bills where Mr. Parker's actual state of mind is clear from the email itself, i.e., that DeHaan was using his own money.

       3.    <u>Hays's other main "red flag," that Lighthouse didn't have any customer accounts, is false</u>.

Another major theme Hays weaves in his fable is that Lighthouse had virtually no real client accounts and therefore no account statements were produced by the custodians.  This patently-false allegation is necessary to Hays's Complaint to support Plaintiff's fantastic, but again false, allegation, that Lighthouse was *unable*, as opposed to *unwilling,* to produce account statements to Defendants in the mock audit.[15]

---

[15] Lighthouse employee Catherine Hardison explained to Defendants that they were not produced *not* because Lighthouse did not have such statements, but because DeHaan had not had time to collect the remaining mock audit items. [Compl. Ex. 18].

11053504

- 21 -

For instance, Hays alleges that the Secretary of State contacted Interactive Brokers "and discovered that virtually none of the accounts existed."  [*Id.* ¶22].  Elsewhere Hays alleges "most of the client accounts had never been opened at all" [*Id.* ¶23] and that the "Interactive Brokers . . . account numbers that DeHaan had provided to it were fictitious."  [*Id.* ¶24].  In one instance, Hays incredibly hypothesizes that an Interactive Brokers account manager failed to respond to a letter from defendant Parker "because Lighthouse had no client accounts custodied there."  [*Id.* ¶60].

The actual facts are that Lighthouse did, in fact, have *all* of the 72 Interactive Brokerage accounts that it told the SOS that it had, plus an additional seven accounts, for a total of 79 Interactive Brokerage accounts.  [Mitchell Decl., ¶¶26, 27 and Ex. C (Joint Appx. Ex.1)].  Also contrary to Hays's allegations, none of the Interactive Brokers account numbers Lighthouse had given the SOS were fictitious. [*Id.*].  Obviously there were many, many account statements, some of which had actually been seen by Defendants and were the subject of a letter Defendants wrote.  [S*ee* Compl. Ex. 14].  This uncomfortable truth, however, does not fit Plaintiff's story—so he mischaracterizes it.  Obviously Plaintiff is not entitled to any inference that Defendants should have been placed on notice by an

alleged absence of accounts or account statements when both the accounts and statements actually existed!

Elsewhere in the Complaint, Hays tries to make it appear that Lighthouse only had "12 active accounts" and suggests that Defendants should have investigated the discrepancy in the number of accounts. [Compl. ¶¶56-57]. But an exhibit attached to the Complaint reveals the reason for the discrepancy: the preliminary file review refers to 12 active accounts but says "pending further review" in the preceding line. [Compl. Ex. 12, p. 3]. Hays can only ask the Court to make the specious inference he urges by omitting this key phrase in the report. Once again, knowing that Lighthouse had at least 79 accounts, Hays tries to mislead the Court into thinking that it had only 12.

4. <u>Defendants' mock audits revealed the substantive deficiencies they were designed to reveal.</u>

Yet another deception by Hays is his mischaracterization of the 2010 mock audit as a "books and records" review designed to "confirm the safeguarding of client funds." [Compl. ¶44]. In fact, it is clear on its face that this "first phase" of a mock audit was limited to a client file review. [*Id.* Ex. 4]. Contrary to Hays's implication, client files do not always contain paper account statements. [(Mitchell Decl., ¶5 (Joint Appx. Ex. 1)]. Plaintiff cannot retroactively expand the scope

of the 2010 audit by an unsupported claim about its scope that contradicts the actual stated scope.  Additionally, Defendants' 2010 mock audit report in fact identified numerous substantive client file deficiencies and was not "focused," as Hays alleges, on the location or color coding of files.  [Compare Compl. Ex. 4 with Compl. ¶44].

Hays also alleges that Defendants ignored a recommendation made in the preliminary mock audit report to conduct due diligence to ensure clients are receiving statements from the custodians.  [Compl. ¶¶58, 73].  In fact, the Complaint itself demonstrates that Defendants went to extraordinary lengths to conduct this due diligence, which started before the 2011 mock audit.  Most obviously, Defendants requested that Lighthouse produce for examination at the mock audit all of the client account statements.  [Compl. Ex. 11, p. 1].  When Lighthouse failed to do so, Defendants noted it as a deficiency in the mock audit report. [Compl. Ex. 19, p. 3].

In paragraph 69 of his Complaint, Hays takes great pains to argue that Defendants "knew that Lighthouse's clients were not receiving account statements from Interactive Brokers."  In fact, the attachments to the Complaint affirmatively show the opposite.  Namely, Interactive Brokers "informed" Hardison that *it was sending account summaries to each of Lighthouse's customers and that these state-*

ments advised "of the online availability of a complete account statement."  [Compl. Ex. 15 (emphasis added)].  Once again, Hays alleges "facts" that are flatly contradicted by his own exhibits.

Hays also blithely alleges that Lighthouse "could not produce monthly account statements from Interactive Brokers" to the SOS during its audit. [Compl. ¶20].  In fact, Lighthouse instantly produced both of the Interactive Brokers account statements the auditor requested during the examination. [Mitchell Decl., ¶6 (Joint Appx. Ex. 1)].  All of the remaining 77 Interactive Brokers account statements were real and were provided by Interactive Brokers to Mitchell on her request.  [*Id.*].

Additionally, with respect to the TD Ameritrade account statements, Hays's own documents show that Defendant Parker was surprised on February 23, 2012 when told that DeHaan had difficulty getting copies of the account statements from TD Ameritrade.  He wrote Ms. Hardison saying it is "not a good thing when an investment adviser can't produce client statements at the drop of a hat." [Compl. Ex. 25].  In an attempt to flip this email on its head, Hays simply labels it "incredible."  [Compl. ¶79].  In other words, Hays himself has to ignore the clear and only reasonable implication of the email – that this was news to Parker – in an attempt to convince the Court to accept his unreasonable infer-

11053504

ences that Parker was already aware of this fact. *Iqbal* does not permit the plain meaning of this email to be thus perverted.[16]

     5.     <u>Hays misrepresents an October 2010 letter in a futile attempt to show that Defendants knew Lighthouse was issuing false account statements to its clients</u>.

The first thing to remember about Defendants' knowledge of Lighthouse's account statements is that in the course of the 2011 mock audit, Defendants requested Lighthouse to produce all of its account statements, and Lighthouse produced none of them to Defendants.  [Compl. Exs. 17 and 19].

In an attempt to show that Defendants in fact knew that Lighthouse was secretly sending fraudulent statements to clients, Plaintiff points to a letter sent by Defendants in October 2010 to conclude, incorrectly, that Defendants were aware that Lighthouse was using software called "Quantplat" to show false account balances to its clients online.  [Compl. ¶67, Ex. 22].  That letter, however, did not mention using the software either to create account statements or to al-

---

[16] Parker drafted communications to regulators based exclusively on information provided from Lighthouse.  Indeed, DeHaan conveyed that he alone had access to the TD Ameritrade Accounts.  [Compl. Ex. 25].  Yet, with full knowledge that Defendant Parker obtained all of his information about the TD Ameritrade statements from DeHaan, Hays alleges that Parker "came up" with the excuse that DeHaan gave the Secretary of State for not being able to produce the TD account statements.  Page Perry merely drafted "proposed language" from what DeHaan told them.  [*See* Compl. Ex. 26].

low clients to access their balances online. [*Id.* Ex. 22]. Rather, the letter exclusively discussed that the software was to be used as a tool by the adviser to determine what securities would be bought and sold for its clients. The statement in the letter that "a person will have to manually place the orders for the transactions dictated by the software" refers to the fact that the adviser would have to log on to the custodian's website and manually place any trade. Indeed, trades can only be placed through a custodian. Obviously, these manually-entered trades would be reflected accurately on the custodial account statements sent to clients, and Hays does not allege otherwise, nor could he. [17]

Hays distorts this letter into a supposed recognition by Defendants that Lighthouse was "manually" entering assets in online brokerage statements available to its clients. But manually placing a trade via a brokerage interface is very different from creating an account statement with false manual entries. The true fact, as shown by the pleadings, was that Defendants were unaware that Light-

---

[17] Hays repeatedly refers to the need for manual entry of trades as a "flaw" or "defect," [Compl. ¶¶68, 69] when in fact almost every investment adviser in the United States makes trades by logging into their broker and putting the trade in manually. Defendant Parker's later reference in Exhibit 23 to something being "problematic" referred to an alternative, but as yet undeveloped, feature of the software by which the software would automatically implement the trades through the custodian without an intervening manual entry. Neither the manual nor the automated trade entry would have resulted in the creation of any fake account statement.

house was sending proprietary statements to its clients, via online access or otherwise.  [*See* Ex. 16, p. 2, § 5.B (If custodian not changed soon Lighthouse will have "no option other than to create and send statements")].

      6.   <u>What the pleadings and exhibits really show</u>.

      Reviewing the sheer scope of Hays's misrepresentations, it would be too charitable to call these allegations mistakes or errors.  Rather, these are all deliberate factual misrepresentations designed to portray Defendants as incompetent or worse and an effort to survive a challenge to the pleadings by alleging facts known to be false and flatly contradicted by the documentary record.

      The Complaint and record, including Complaint exhibits, conclusively demonstrate that Defendants repeatedly advised Lighthouse not to accept checks from its clients and to make sure clients received account statements so they could detect any fraud that might be occurring in their accounts.  Lighthouse failed to do this. Interactive Brokers confirmed to Defendants and Lighthouse that it was sending account statements.  Defendants wrote to Interactive Brokers in an attempt to obtain even more detailed statements.

      In 2011 Defendants conducted a mock audit in which they asked for all of Lighthouse's client account statements, financial statements, and its general ledger.  Lighthouse failed to produce its client account statements, including fake

account statements it had secretly been sending its clients.  Lighthouse also failed to produce either financial statements or its general ledger.  In this way, Lighthouse continued to hide its fraud from Defendants.

When the Secretary of State commenced an examination in December 2011, Lighthouse was forced to produce financial statements and a general ledger. Defendants began to review these at the same time as the regulators and, before either Lighthouse or the Defendants were aware that the regulators had opened an investigation, Defendants noticed suspicious activity in the Pass Through account and recommended that it be audited.  At one point, tired of waiting for this audit, Defendants even demanded that the records of the Pass Through account be delivered to their office. Lighthouse continued to hide the records of this account. [*Id.* Ex. 30]

During this period, Page Perry learned the SEC was investigating **Lighthouse**.  [*Id.* Ex. 31].  Page Perry agreed to expand its representation of Lighthouse. [*Id.* Ex. 31]. In exchange, Lighthouse paid Page Perry an additional retainer, since its defense of Lighthouse fell outside its previously executed retainer agreement.  [Compl. Exs. 2, 31].

Finally, when the SEC demanded the Pass Through account records, Lighthouse finally had to turn them over to the Defendants.  On examining them,

Defendants were the first to discover that Lighthouse was stealing its clients' money.  By this time—late May—because of DeHaan's repeated lies, Page Perry had tentatively decided to withdraw from representation of Lighthouse and so drafted a letter to that effect.  [Compl. Ex. 32].  Memorializing the firm's concerns, Page Perry drafted a withdrawal letter on May 25 2012. [Id].  That same day, however, DeHaan granted Page Perry permission to report his actions to the SEC and agreed he would cooperate with an SEC "accounting of Lighthouse and its affiliates."  [Compl. ¶110; Diskin Decl. ¶ 8 (Joint Appx. Ex. 2)].  In light of these developments, Page Perry decided not to withdraw and, instead, scheduled a meeting with the SEC.  [*See* Compl. ¶¶89-90; Diskin Decl. ¶¶7-8 (Joint Appx. Ex. 2)].

Page Perry met with the SEC on May 30, 2012, and teleconferenced on June 1, 2012.  [Diskin Decl. ¶¶8-9 (Joint Appx. Ex. 2)].[18]  At the teleconference, Page Perry informed the SEC that it had recently learned that DeHaan had misappropriated substantial funds from clients' accounts and that it appeared, based on what the firm had seen at that point, that the amount of those funds to be probably "in the high six figures."  [Diskin Decl. ¶9 (Joint Appx. Ex. 2); Compl. Ex. 33].

---

[18] Hays falsely alleges that Defendants only met with the SEC to report Lighthouse's fraud after they withdrew from representation.  [Compl. ¶94].

At the same time that DeHaan was seemingly cooperating with both Page Perry and the SEC, however, he continued lying to Page Perry. Nowhere was this more evident than when DeHaan circulated a "pitchbook" to Lighthouse clients that falsely represented that Lighthouse "had a pre-IPO allotment of discounted Facebook stock." [Compl. Ex. 35]. Months earlier, on October 4, 2011, DeHaan told Page Perry that he "saw no use for" a proposed pitchbook, which "was briefly discussed and scrapped." [Compl. Ex. 16]. And by not using a prospectus—which is why Hays has no record of one attached to his complaint— DeHaan was able to orchestrate the fraud without detection from either Page Perry or the SEC.

Fortunately, in early June, after Parker and Terry realized that DeHaan had misappropriated funds, and in conjunction with their first meeting with the SEC, Parker and Terry convinced DeHaan to transfer approximately $600,000 into a special trust account to be used for restitution to Lighthouse advisory clients. [Diskin Decl. ¶17 (Joint Appx. Ex. 2); First Interim Report of Receiver, Ex. 2, SEC Action (Doc. 23) (Joint Appx. Ex. 3)]. An additional $69,214 was moved from Page Perry's general account to the special trust account. [*Id.*] [19] Thereafter, on

---

[19] The Complaint alleges that Lighthouse paid Defendants a $90,000 retainer on or about May 29, 2012, but it does not allege how much of that amount was

July 2, 2012, Hays was appointed Lighthouse's receiver and the contents of the special account turned over to him.  [Compl. ¶27].

## ARGUMENT AND CITATION OF AUTHORITY

The burden is on Hays to set out "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " Determining whether a Complaint states a plausible claim for relief will . . . be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.  In *Iqbal* and *Twombly*, the Supreme Court set forth a two-part analysis of plausibility:  "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions.'  And '[t]hreadbare recitals of the el-

---

earned by Page Perry and paid to itself as opposed to being unearned and therefore retained in Page Perry's trust account, which was ultimately paid to the receiver.  [Compl. ¶90; Diskin Decl. ¶17 (Joint Appx. Ex. 2); First Interim Report of Receiver, Ex. 2, (Joint Appx. Ex. 3)].

In fact, Hays's First Interim Report shows Hays has received a total of $669,214 from Page Perry—$69,214 more than the $600,000 initially moved into Page Perry's special restitution trust account.  That additional sum came from the unused portion of Page Perry's $90,000 retainer.   Of course, hiding the fact that Hays himself received two-thirds of Page Perry's retainer check makes the Defendants seem greedy, clearly Hays's aim.  No such inference should be drawn.

ements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). " Second, only a Complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Iqbal*, 556 U.S. at 679.  A claim is only plausible when "the plaintiff pleads factual content that allows the court to draw the *reasonable* inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (emphasis added).  Hays has not plead sufficient facts to allow the Court to draw the inferences required to allow the case to proceed.

## A.   Counts I, II, And III Should Be Dismissed Because The Complaint Establishes Page Perry Complied With The Duties They Owed Lighthouse.

Counts I (Professional Malpractice); II (Breach of Contract); and III (Breach of Fiduciary Duty) in Hays's Complaint assert claims based on an attorney's duties to his client.  These counts should be dismissed because Hays's Complaint

does not establish a plausible claim that either Parker, Terry or Page Perry breached legal duties owed to Lighthouse.[20]

1.    Page Perry fully complied with Rule 1.13.

Rather than setting forth a basis for relief, Hays's Complaint actually establishes that Page Perry complied with the legal duties it owed Lighthouse and fully adhered with the Georgia Rules of Professional Conduct.  As Lighthouse's lawyer, Page Perry was subject to Rule 1.13. Under that Rule, a corporation's lawyer must report a corporate constituent's conduct to the "highest authority that can act on behalf of the organization" when (i) the lawyer *knows* that a corporate constituent is engaged in illegal conduct that will, (ii) bind the company, and (iii) substantially injure it. GA. R. PROF'L CONDUCT 1.13(b).  The rules define the term "knows," italicized above, as: having "actual knowledge of the fact in question."   GA. R. PROF'L CONDUCT 1.0(i).  A person's knowledge "may be inferred from the circumstances." *Id.*

The facts alleged by Hays are insufficient to demonstrate that Defendants knew of Lighthouse's fraud any earlier than May 2012, when they recommended

---

[20] Count IV for respondeat superior, naming Page Perry, is susceptible to dismissal inasmuch as the Complaint fails to state a claim against any one of the individual named Defendant attorneys.  *See* Argument, I.A. of Brief in Support of Motion to Dismiss Defendants Perry, Page and MacIntyre.

that Lighthouse self-report to the authorities.  Indeed, the regulators had the same information that Hays claims was direct evidence of Lighthouse's theft—most significantly the balance sheet entry labeled "Client Holding-Pass Through."  Yet the regulators did not conclude from that, or from any of the other facts the regulators gathered in their several month long investigation, that Lighthouse was stealing.  [*See generally* Allegations, B.2, *supra*].  The undisputed evidence filed by Hays himself is that Defendants were urging, through the mock audit and afterwards, for Lighthouse either to produce the account statements or have the account audited.  Ultimately, as a result only of Defendants' persistence—combined with the not insignificant fact that the SEC subpoenaed the records that Defendants could only ask Lighthouse to produce voluntarily—Defendants discovered Lighthouse's theft in late May 2012.

But even if the Court were to allow the Complaint to proceed on the allegation that Page Perry "knew," Rule 1.13(c) provides only that Defendants were obliged to report to the highest authority within the organization, which was DeHaan.  Plaintiff does not allege, and cannot allege, that this would have stopped the fraud.  Indeed DeHaan likely only agreed to Defendants' recommendation to self-report in 2012 because he had concluded that detection by the regulators was inevitable.  If Defendants had discovered his fraud in 2011 and

urged him to remonstrate or turn himself in, there is no basis to believe he would have done it.  The most likely consequence would have been withdrawal by the Defendants from Lighthouse representation, which would only have left DeHaan free to keep right on stealing—likely without anyone in place to discover it as Defendants later did.

If the "highest authority" fails to address illegal conduct the lawyer has knowledge of, "then the lawyer **may** reveal information relating to the representation whether or not Rule 1.6 permits such disclosure, but only if and to the extent the lawyer reasonably believes necessary to prevent substantial injury to the organization."  GA. R. PROF'L CONDUCT 1.13(c).  Consequently, in Georgia an organization's lawyer is permitted, but **never obligated** to disclose a corporate constituent's malfeasance to regulators.

Georgia's permissive, but non-obligatory, "reporting out" duty is consistent with the ethical tradition governing lawyers.  Summarizing the state of the law, the Third Restatement of the Law Governing Lawyers, in pertinent part, provides:

> A lawyer may use or disclose confidential client information when the lawyer reasonably believes that its use or disclosure is necessary to prevent a crime or fraud…A lawyer who takes action **or decides not to take action permitted under this Section is not**, solely by reason of such action or inaction, **subject to professional discipline, li-**

**able for damages to the lawyer's client or any third person, or barred from recovery against a client or third person**.

RESTATEMENT (THIRD) OF LAW GOVERNING LAW LAWYERS § 67 (2000) (emphasis added).  Likewise, the Sarbanes Oxley Act—which aims to prevent the adverse consequences that arise where a publicly-traded company commits fraud— recognizes this principle of an attorney-client relationship and never requires lawyers to report evidence of a public company's material violation of a law to regulators.  15 U.S.C. §§ 7241-7266 (2003).

Hays's Complaint establishes beyond doubt that Page Perry fully complied with Rule 1.13 by reporting (in writing) all of the potential securities compliance deficiencies it had become aware of to Lighthouse's CEO and its office manager.  Through 2011, Hays's allegations only create a reasonable inference that Page Perry knew that Lighthouse's customer accounts were housed with a custodian, but that DeHaan was unwilling to provide Page Perry with access to those records.  This is precisely what Page Perry reported to DeHaan in two detailed mock audit reports.

Similarly, in early 2012, Page Perry reported its concerns to the "highest authority that could act on" Lighthouse's behalf, DeHaan, when Page Perry became concerned about Lighthouse's failure to produce records to the Secretary of State's office.  [*Id.* Ex. 25].  And when Page Perry grew suspicious of the Pass

Through account, it again reported its concerns to DeHaan, advised him to close the account, and advised Lighthouse to audit the account.  [*Id*. Exs. 27, 28, 29].  In fact, Hays's Complaint even concedes that Page Perry affirmatively sought to correct deficiencies identified during the Secretary of State's Audit.  [Compl. ¶120].

Hays's Complaint attempts to sidestep Page Perry's compliance with its ethical obligations by inventing a new duty—the duty to report a corporate constituent's misconduct to a third-party regulator—and then to apply that duty retroactively to Page Perry.  In support, Hays advances a non-sensical interpretation of Rule 1.13 of the Georgia Rules of Professional Conduct:  that Page Perry was obligated to report DeHaan's misconduct because Lighthouse's '"highest authority' was the SEC or the Georgia Securities Commissioner."  [Compl. ¶107]. Not a single Georgia state or federal decision has ever upheld that construction, however, and for good reason; it would render Rule 1.13(c) meaningless.  [*See generally* O.C.G.A. § 13-2-2(4) (stating that the construction that upholds every part is to be preferred)].

Indeed, Rule 1.13(c)'s plain language establishes that "the highest authority **that can act on behalf of the organization**"—note that words essential to the meaning are again missing from Hays's Complaint—does not include state or

federal regulators.  In particular, Subsection (c) provides that if the highest authority <u>fails to address</u> the illegal conduct that the lawyer has knowledge of, "then the lawyer may reveal information relating to the representation whether or not Rule 1.6 permits such disclosure, but only if and to the extent the lawyer reasonably believes necessary to prevent substantial injury to the organization." GA. R. PROF'L CONDUCT 1.13(c).  If the "highest authority" signified outside state and federal regulators, as opposed to the president or CEO of the company, then there would be no one else to whom the lawyer could possibly reveal the information.  This is a nonsensical interpretation of the Rule and one that is totally unsupported in legal authority anywhere.

Page Perry reported everything that it learned to the highest authority within Lighthouse, DeHaan, and issued appropriate warnings and recommendations to cure the concerns, going so far as to recommend that the company and DeHaan turn themselves in to the regulators.  No reasonable inference can be drawn from the facts alleged that Defendants had a further obligation to report earlier to regulators.  Hays's claim should be dismissed.

**2.**    <u>Page Perry never violated rule 1.7 of the Georgia Rules of Profes-
sional conduct</u>.

Page Perry never violated Rule 1.7 of the Georgia Rules of Professional

Conduct because it represented Lighthouse exclusively for all purposes except

the April 2012 examination under oath, at which time it also represented

DeHaan.  But at that time it knew of no conflict of interest and no facts suggest

otherwise.  Rule 1.7 provides that "a lawyer shall not represent or continue to

represent a client if there is a significant risk that the lawyer's own interests or

the lawyer's duties to another client, a former client, or a third person will mate-

rially and adversely affect the representation of the client."   GA. R. PROF'L CON-

DUCT 1.7(a). Hays's Complaint demonstrates that as soon as Page Perry learned

of DeHaan's misappropriations (which were also crimes by Lighthouse), *after* the

examination under oath, it advised Lighthouse to turn itself in to the regulators.

Page Perry's brief representation of both Lighthouse and DeHaan during

the SEC examination under oath demanded that it prepare and defend Light-

house's owner and CEO to provide sworn testimony—because that testimony

concerned Lighthouse. But nothing in Hays's Complaint creates a reasonable in-

ference that DeHaan sought or received legal advice in his individual, as op-

posed to his corporate, capacity during this period of time. It is for this reason

that Page Perry's draft withdrawal letter "confirms that our law firm never represented [DeHaan] personally . . . ." [Compl. Ex. 32].

Even assuming *arguendo* that Hays's Complaint creates a reasonable inference that Page Perry represented DeHaan personally, a conflict of interest, standing alone, cannot serve as the basis for malpractice liability." *See Davis v. Findley*, 262 Ga. 612, 613 (1992). Instead, Hays must create a reasonable inference that Page Perry's conflicting loyalties damaged Lighthouse. Hays cannot do so because Defendants' advice that Lighthouse self-report directly resulted in DeHaan's imprisonment. There can be no allegation that Defendants gave any advice that favored DeHaan over Lighthouse.[21]

Hays's Complaint alleges that Page Perry committed only two bad acts after undertaking DeHaan's individual representation in April of 2012— preparing a pitchbook marketing a Facebook investment and a prospectus describing the investment. But these allegations alone cannot and do not create the reasonable inference that Page Perry actually prepared these documents under *Iqbal*.

---

[21] Hays seems to be taking the position that a lawyer who represents someone who is stealing must be advising the client to steal. That is ridiculous. A lawyer is presumed to act consistently with his ethical obligations unless Plaintiff comes forward with actual evidence to the contrary, which Plaintiff cannot do. Here there is no factual allegation that the brief representation of DeHaan negatively influenced Defendants' advice to Lighthouse.

And with respect to the pitch book, contrary to the attempted inference, Hays's Complaint attaches the minutes of an October 2011 meeting where DeHaan informed Page Perry that the pitchbook would be scrapped. [Compl. Ex. 16]. Nothing whatsoever exists to suggest that Page Perry—during the same month that it tried to convince Lighthouse to report itself to the SEC—actually drafted a pitchbook marketing an investment. Indeed, Page Perry advised Lighthouse that any pitchbook must "closely track the [Private Placement Memorandum] and must contain a warning that it is qualified by the PPM." [*Id.*, p. 3]. Hays does not allege that the pitchbook attached to his Complaint does either of those things, nor can he. In the absence of such an allegation, the only reasonable inference is that the attached pitchbook violated Page Perry's instructions.

In fact, the historical pattern of DeHaan's lies and deceptions to his lawyers, and the clear facts as alleged in the Complaint that Page Perry had expended great effort in encouraging DeHaan to cause Lighthouse to comply with the law, allows only one reasonable inference: that Page Perry in fact had nothing to do with any such extralegal activities as a "pitchbook" or prospectus marketing a nonexistent offering.

3.    Page Perry is not liable for Dehaan's misrepresentations concerning
      custody.

Hays's Complaint makes clear that Page Perry filled out Lighthouse's
Form ADV correctly for DeHaan's signature given all the information at its dis-
posal. A securities professional can only input content contained in securities
forms by gathering that content from the professional's client. *See Janus Capital
Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). Implicit in that
fact is that the documents' contents are attributed to the client "and . . . attribu-
tion within a statement or implicit from surrounding circumstances is strong ev-
idence that a statement was made by—and only by—the party to whom it is at-
tributed." *Id.* For this reason, the law does not hold securities professionals liable
for failing to ferret out a client's misinformation from documents the professional
prepares. *Id.*

While Hays asserts that Page Perry should have known or should have de-
termined that Lighthouse actually had custody of client funds, he never alleges
how Page Perry could have made that determination. Instead, Hays's Complaint
demonstrates repeatedly that Page Perry asked Lighthouse the right questions
concerning custody and that DeHaan actively lied to his lawyers. Later, DeHaan
lied to Page Perry that the Pass Through account had a "zero balance." But be-

cause Page Perry had no access to Lighthouse's records or accounts, Hays creates no basis for a reasonable inference that Page Perry knew Lighthouse actually had custody. Any misstatement contained in the ADV may only be attributed to DeHaan.

This claim also fails because Hays cannot demonstrate "that 'but for the [attorney's] error, the outcome would have been different." *Szurovy v. Olderman*, 243 Ga. App. 449, 452 (2000) (quoting *Houston v. Surrett*, 222 Ga. App. 207, 209 (1996); s*ee also, Hopkinson v. Labovitz,* 263 Ga. App. 702 (2003); *Studio X, Inc. v. Weener, Matson & Nathan, LLP,* 276 Ga. App. 652, 654 (2005).

Assuming *arguendo* that Page Perry should have been aware that the Pass Through account potentially gave Lighthouse custody of client assets in February 2012, Lighthouse's annual updating ADV form was not filed until March of 2012, as the rule requires. At that point, the Secretary of State: was approximately four months into its review of Lighthouse; was aware that the Pass Through account existed and that it contained funds; and was contacting Lighthouse's custodians directly. [Mitchell Decl. Ex. C (Joint Appx. Ex. 1)]. Moreover, within days after Lighthouse filed its form ADV, the SEC opened its investigation into Lighthouse.

By the time the form was filed, the regulators knew more about DeHaan's Pass Through account and custodial activity than did Page Perry —yet they had taken no action against DeHaan. As a result, it is plainly speculative that Lighthouse's March, 2012 ADV Form filing could have prolonged DeHaan's fraud.

**B.     Hays's Counts II and III Are Duplicative of His Legal Malpractice Claim and Should Be Dismissed.**

Hays's Complaint improperly attempts to multiply a legal malpractice claim into three separate causes of action. Georgia law prohibits that duplication where, as here, Hays's breach of fiduciary duty and breach of contract claims arise exclusively from the same professional services that form the basis for his malpractice claim. *Oehlerich v. Llewellyn*, 285 Ga. App. 738, 741 (2007); *see also McMann v. Mockler*, 233 Ga. App. 279, 282 (1998).

Hays asserts that Page Perry breached fiduciary duties "by treating DeHaan as their client and putting his interest above that of Lighthouse." [Compl. ¶125]. Hays advances that same allegation against Page Perry and Parker in its malpractice allegations: "Page Perry and the individual Defendants also violated GRPC 1.7 when they agreed to represent DeHaan and Lighthouse in the SEC investigation, since DeHaan was being investigated for misappropriating funds from Lighthouse." [Compl. ¶115].

11053504

Similarly Hays's breach of contract allegation relies on the same allegations he advances in the malpractice section: "failing to properly advise Lighthouse with respect to the numerous regulatory violations by DeHaan, failing to address the material regulatory deficiencies it discovered or should have discovered in the mock audits, and failing to act in Lighthouse's best interest with respect to known regulatory violations and other misconduct by DeHaan, all to Lighthouse's detriment." [*Id*. ¶133].

Underlying both of these claims is the allegation that Defendants breached the duty of care and loyalty they owed Lighthouse. As a result, Hays's breach of fiduciary duty claim should be dismissed because it duplicates his malpractice claim.

## CONCLUSION

Ponzi schemes leave many victims in their wake. That Ben DeHaan stole millions of dollars though Lighthouse is undisputed. Plaintiff's own Complaint and exhibits, however, clearly demonstrate that Defendants diligently exercised their professional and ethical responsibilities, were instrumental in uncovering and stopping this fraud, and directly enabling the preservation of $660,000 to be returned to this scheme's victims.

11053504

For the foregoing reasons, the Court should grant Page Perry's Motion to Dismiss Plaintiff's Complaint in its entirety.

This 7th day of February, 2014.

HAWKINS PARNELL
   THACKSTON & YOUNG LLP

*/s/ Christine L. Mast*

_____

Christine L. Mast
Georgia Bar No. 461349
H. Lane Young II
Georgia Bar No. 781950
Zachary Lewis
Georgia Bar No. 689146

*Counsel for Defendants*

4000 SunTrust Plaza
303 Peachtree Street
Atlanta, GA  30308-3243
(404) 614-7400 *(telephone)*
(404) 614-7500 *(facsimile)*

11053504

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

SECURITIES AND EXCHANGE COMMISSION,
    Plaintiff,

v.

BENJAMIN DANIEL DEHAAN and
LIGHTHOUSE FINANCIAL PARTNERS, LLC,
    Defendants.

Civil Action File No.
1:12-CV-1996-TWT

---

S. GREGORY HAYS, Receiver for
LIGHTHOUSE FINANCIAL PARTNERS, LLC,
    Plaintiff,

v.

PAGE PERRY, LLC, ESTATE OF
J. BOYD PAGE, ALAN R. PERRY, JR.,
J. STEVEN PARKER, ROBERT D. TERRY,
and DANIEL I. MACINTYRE,
    Defendants.

Ancillary Proceeding
No. 1:13-CV-03925-TWT

---

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the foregoing

***CORRECTED* BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S**

**COMPLAINT AGAINST DEFENDANTS PAGE PERRY LLC, J. STEVEN**

**PARKER AND ROBERT D. TERRY** with the Clerk of Court using the CM/ECF

system, which will automatically send e-mail documentation of such filing to the

following attorneys of record for Plaintiff:

> Allison S. Hines Ficken, Esq.
> Edward Joseph Dovin, Esq.
> Dovin Malkin & Ficken, LLC
> Suite 2775
> Five Concourse Parkway
> Atlanta, Georgia  30328
> ahficken@dmflawfirm.com
> ejdovin@dmflawfirm.com

I also certify that, pursuant to LR 5.1B, ND Ga., the above document was

prepared in Book Antiqua 13 pt. font.

This 7th day of February, 2014.

> **HAWKINS PARNELL**
> **THACKSTON & YOUNG LLP**
>
> */s/ Christine L. Mast*
> _____
> Christine L. Mast
> Georgia Bar No. 461349
> H. Lane Young
> Georgia Bar No. 781950
> Zachary Lewis
> Georgia Bar No. 689146
> *Counsel for Defendants*

4000 SunTrust Plaza
303 Peachtree Street
Atlanta, Georgia  30308-3243
(404) 614-7400 *(telephone)*
(404) 614-7500 *(facsimile)*
cmast@hptylaw.com
lyoung@hptylaw.com
zlewis@hptylaw.com

11053504